**AMERICAN GAS & ELECTRIC CO. v. SE-
CURITIES & EXCHANGE COM-
MISSION.
No. 7948.**

United States Court of Appeals for the
District of Columbia.

Decided Feb. 1, 1943.

Writ of Certiorari Denied June 1, 1943.

See 63 S.Ct. 1318, 87 L.Ed. ——.

634

Mr. Frederic L. Ballard, of Philadelphia, Pa., for petitioner.

Mr. Lawrence S. Lesser, of Washington, D. C., with whom Mr. Chester T. Lane, General Counsel, of Washington, D. C., and Mr. Christopher M. Jenks, Assistant General Counsel, of Philadelphia, Pa., appeared on the brief, all of the Securities and Exchange Commission, for respondent.

Before STEPHENS, VINSON, and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

This is a petition of the American Gas and Electric Company to review an order of the Securities and Exchange Commission.[1] The order denied petitioner's application for an order, pursuant to Section 2(a) (8) of the Public Utility Holding Company Act of 1935, declaring it to be not a subsidiary of Electric Bond and Share Company.[2]

---

[1] Section 24(a) of the Public Utility Holding Company Act of 1935, 49 Stat. 834 (1935), 15 U.S.C. § 79x (1940).

[2] Section 2(a) (8) [49 Stat. 807 (1935), 15 U.S.C. § 79b (1940)] provides that, "The Commission, upon application, *shall by order declare that a company is not a* *subsidiary company of a specified holding company under clause (A) if the Commission finds that* (i) the applicant is not controlled, directly or indirectly, by such holding company (either alone or pursuant to an arrangement or understanding with one or more other persons) either through one

Petitioner and Bond and Share are both registered holding companies under the Act. Petitioner is a New York corporation which owns directly all of the outstanding securities of eleven electric utility companies which supply electric light and power to approximately 830,000 customers in New Jersey, Pennsylvania, Ohio, Indiana, Michigan, Virginia, West Virginia, Kentucky and Tennessee.[3] Through its wholly-owned subsidiary, American Gas and Electric Service, petitioner furnishes its operating companies with management and supervisory services.

As of March 30, 1940, petitioner's capitalization consisted of 355,623 shares of 4¾ per cent cumulative preferred stock (par $100) and 4,482,737 shares of common stock (par $10). Both common and preferred shareholders are entitled to one vote per share.[4] Bond and Share owns 846,985 shares of common stock, which constitute 17.51 per cent of the outstanding voting securities.[5]

Petitioner is therefore a subsidiary of Bond and Share under clause (A) of Section 2(a) (8).[6] However, petitioner maintains that it satisfies the conditions prescribed by the last paragraph of clause (B) of Section 2(a) (8), that (1) it is not controlled, directly or indirectly, by Bond and Share; (2) it is not an intermediary company through which control of another company is exercised; and (3) its manage-

or more intermediary persons or by any means or device whatsoever, (ii) the applicant is not an intermediary company through which such control of another company is exercised, and (iii) *the management or policies of the applicant are not subject to a controlling influence, directly or indirectly, by such holding company* (either alone or pursuant to an arrangement or understanding with one or more other persons) *so as to make it necessary or appropriate in the public interest or for the protection of investors or consumers that the applicant be subject to the obligations, duties, and liabilities imposed in this title [chapter] upon subsidiary companies of holding companies.* The filing of an application hereunder in good faith shall exempt the applicant from any obligation, duty, or liability imposed in this chapter upon the applicant as a subsidiary company of such specified holding company until the Commission has acted upon such application. Within a reasonable time after the receipt of any application hereunder, the Commission shall enter an order granting, or, after notice and opportunity for hearing, denying or otherwise disposing of, such application." (Italics supplied.)

3 Petitioner's wholly-owned subsidiaries are: Appalachian Electric Power Company, Atlantic City Electric Company, Indian General Service Company, Indiana and Michigan Electric Company, Kanawha Valley Power Company, Kentucky and West Virginia Power Company, Inc., Kingsport Utilities, Incorporated, the Ohio Power Company, the Scranton Electric Company, Southern Ohio Public Service Company, and Wheeling Electric Company. Atlantic City Electric Company owns 50 per cent of the outstanding voting securities of the Deepwater Operating Company and the Ohio Power Company owns 50 per cent of the outstanding voting securities of Beech Bottom Power Company, Inc. Petitioner also has a number of small subsidiaries, which are engaged in business as realty, steam-heating, coal, and short-line railroad companies.

4 In the event that preferred stock dividends are in arrears a full year, two additional directors may be elected exclusively by the preferred stockholders. If arrearages accumulate for three years, the preferred stockholders have the right to elect a majority of the board of directors. There has been no default in payment of either the preferred or common stock dividends, and dividends on both preferred and common have been paid each year since 1912.

5 Bond and Share also owns 20.7%, 42.4%, 46.6%, and 47%, respectively, of the outstanding voting securities of American Power and Light Company, American and Foreign Power Company, Inc., National Power and Light Company, and Electric Power and Light Corporation, all registered holding companies under the Act. For this case, these companies are considered as "acknowledged" subsidiary companies of Bond and Share. Utility companies in the Bond and Share system operate in 27 states and 13 foreign countries.

6 Clause (A) of Section 2(a) (8) [49 Stat. 807 (1935), 15 U.S.C. § 79b (1940)] defines a subsidiary company of a specified holding company to be "any company 10 per centum or more of the outstanding voting securities of which are directly or indirectly owned, controlled, or held with power to vote, by such holding company (or by a company that is a subsidiary company of such holding company by virtue of this clause or clause (B), unless the Commission, as hereinafter provided, *by order declares such company not to be a subsidiary company of such holding company.*" (Italics supplied.)

ment and policies are not subject to a controlling influence, directly or indirectly, by Bond and Share so as to make it necessary or appropriate in the public interest or for the protection of investors or consumers that it be subject to the obligations, duties and liabilities imposed by the Act upon subsidiary companies of holding companies.

The Commission concluded that the evidence would not support a declaration under (3), that petitioner was not a subsidiary of Bond and Share and therefore no findings were made on the question of "control" under (1) and (2). This petition presents the single question whether there is substantial evidence to support the Commission's findings that petitioner's management and policies are subject to a "controlling influence" of Bond and Share so as to make it necessary or appropriate in the public interest that petitioner be subject to the Public Utility Holding Company Act as a subsidiary of Bond and Share.[7]

Petitioner's principal argument is that the Commission fell into error in arriving at the ultimate fact of "controlling influence" by drawing inferences from past relationships between petitioner and Bond and Share which are "directly contrary to substantial, direct, contemporaneous and uncontradicted evidence dealing with the present situation." The Commission stated its position as follows: "We believe * * * that the facts set out * * * show past relationships between applicant [petitioner] and Bond and Share which clearly 'have resulted in a personnel and tradition which make applicant [petitioner] responsive to Bond and Share's desires * * *.' "[8]

The facts which sustain the Commission's findings are substantially as follows.

*Organization.* Petitioner was organized by Bond and Share in 1906 to purchase all the assets of the Electric Company of America, which consisted principally in securities of utility companies, which were controlled by the Electric Company and which served communities in Illinois, Indiana, New Jersey, New York, Ohio, Pennsylvania and West Virginia. The details of petitioner's organization were handled by Bond and Share's board of directors and general counsel. Eleven of the fifteen original directors and all the original officers were affiliated with either Bond and Share or its general counsel.

Petitioner's original capitalization consisted of $6,282,000 99-year 5 per cent collateral trust bonds, $3,500,000 preferred stock, and $3,500,000 common stock. The $6,282,000 collateral trust bonds were issued at the time of the organization in return for the Electric Company properties. At the time of organization $2,500,000 (at par) of common and $1,200,000 (at par) of preferred stock were also issued. Of the common stock, $1,300,000 was used for promotion costs, Bond and Share retaining $235,000 for its part in petitioner's organization. Bond and Share sold the remaining $1,200,000 of common and the $1,200,000 of preferred stock for $1,200,000. At the end of the organization transactions Bond and Share retained for itself 4,856 shares of common stock, which amounted to 9.7 per cent of petitioner's outstanding voting securities. Bond and Share's holdings of petitioner's voting securities remained at

---

[7] The Commission has been sustained upon similar facts in four recent cases. Pacific Gas & Electric Co. v. Securities and Exchange Commission, 9 Cir., 1942, 127 F.2d 378, rehearing granted, June 6, 1942; Detroit Edison Co. v. Securities and Exchange Commission, 6 Cir., 1941, 119 F.2d 730, certiorari denied, 1941, 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497; Hartford Gas Co. v. Securities and Exchange Commission, 2 Cir.1942, 129 F.2d 794; Public Service Corp. of New Jersey v. Securities and Exchange Commission, 3 Cir., 1942, 129 F.2d 899, certiorari denied Dec. 14, 1942, 63 S.Ct. 266, 87 L.Ed. —.

[8] For varying degrees of "past history" as evidence of "controlling influence," see, e. g., the following decisions of the Commission: Pacific Gas and Electric Co., 1941, 9 S.E.C. —, Holding Company Act Release No. 2988, petition denied, Pacific Gas & Electric Co. v. Securities and Exchange Commission, 9 Cir., 1942, 127 F.2d 378; The Detroit Edison Co., 1940, 7 S.E. C. 968, petition denied, Detroit Edison Co. v. Securities and Exchange Commission, 6 Cir., 1941, 119 F.2d 730; Public Service Corp. of New Jersey, 1941, 9 S.E.C. —; Holding Company Act Release No. 2998, petition denied, 3 Cir., 1942, 129 F. 2d 899; Panhandle Eastern Pipe Line Co., 1941, 9 S.E.C. —, Holding Company Act Release No. 2778; H. M. Byllesby & Co., 1940, 6 S.E.C. 639; Paul Smith's Hotel Co., 1941, 9 S.E.C. —; Holding Company Act Release No. 2854; Engineers Public Service Co., 1941, 9 S.E.C. —; Holding Company Act Release No. 2897; Manchester Gas Co., 1940, 7 S.E. C. 57.

approximately 9.7 per cent until 1929. They rose to 17.51 per cent in 1929 and 1930.

*Management.* Petitioner's board of directors has consisted, from its organization, generally of 15 members, although in some years it has fluctuated between 14 and 16. As shown above, the original board consisted of 11 Bond and Share men. According to the Commission's findings "most of the key men in American Gas [petitioner] were taken into the organization at a time when it was clearly controlled by Bond and Share." The Commission states its position in its "conclusions" that "it is fair to infer that Bond and Share believed them to be friendly to its interests at the time they were selected. Moreover, these men are indebted for their advancement over the years and for their present status to Bond and Share and the Bond and Share management." These facts, the Commission found, show past relationships which have resulted in "personnel and tradition" which cause the petitioner to be responsive to Bond and Share.

Petitioner concedes that during the years when Bond and Share acted as petitioner's fiscal agent, during most of which it had a material representation on petitioner's board and executive committee, Bond and Share "had such an influence in the affairs of American Gas [petitioner] as could properly have been called a 'controlling influence' over its 'management or policies' had the Act been in effect in those years." Bond and Share's functioning as petitioner's fiscal agent ceased in 1928-31. Since 1931 petitioner has handled its own financing, and Bond and Share's representation on petitioner's board has diminished until only two of the fifteen directors and one member out of five on the executive committee have any formal connection with Bond and Share. As a part of Bond and Share's diminishing influence petitioner's officers have resigned from the boards of acknowledged subsidiaries in the Bond and Share system. Petitioner says these facts show the Commission's conclusion that "past relationships * * * have resulted in a personnel and tradition making petitioner responsive to Bond and Share's desires" is not supported by substantial evidence, because the basic facts relied on by the Commission do not give a rational or coherent support to the Commission's inferential findings.

The Commission relies on the following facts for the basis from which to infer "a personnel and tradition."

The chairman of petitioner's board of directors and executive committee from its organization until the present time has been a man of authority and influence in the Bond and Share's system. S. Z. Mitchell held that position from 1907 until his retirement in 1933. Mitchell was in charge of petitioner's financial policies and was influential with its growth and development through the acquisition of new properties. During this same period he served as a director and member of the executive committee of Bond and Share from its organization in 1905 to 1933; he was president of Bond and Share for 20 years and chairman of its board of directors from 1923 to 1933; when American Power and Light Company and Electric Power and Light Corporation, both registered holding companies and acknowledged subsidiaries of Bond and Share, were organized in 1909 and 1925, respectively, Mitchell became chairman of their boards of directors and member of their executive committees; and from 1925 to 1933 he was also chairman of the board of the National Power and Light Company, similarly a registered holding company and an acknowledged subsidiary of Bond and Share.

Upon Mitchell's retirement in 1933 C.E. Groesbeck assumed the key positions in the management of petitioner, Bond and Share, and the remaining holding companies in the Bond and Share system. In 1935 Groesbeck resigned from the boards of directors of American Power and Light Company, National Power and Light Company, and Electric Power and Light Corporation. However, he still retains his positions as chairman of both petitioner's and Bond and Share's boards of directors and executive committees. But he draws no salary from petitioner. As chief executive of Bond and Share he draws its top salary.

Petitioner's chief operating executive is its president, G. N. Tidd. He became petitioner's vice president in 1910, and president in 1923. Prior to 1910 he had managed the Indiana properties of the Electric Company, and was transferred to petitioner's operating personnel when it acquired these properties. As petitioner's president, Tidd has been responsible to the executive committee, whose chairman has been Bond and Share's chief executive and the majority of whose members were directors of Bond

and Share or of acknowledged subsidiaries in the Bond and Share system. Also, the Commission put considerable emphasis on the fact that Tidd served as petitioner's vice president and president during the period of its growth at a time when its management and policies were admittedly subject to a controlling influence of Bond and Share. Tidd has been a member of the board of directors and executive committee of a number of Bond and Share's acknowledged subsidiaries during the years he has served as president of petitioner. He resigned from these positions between 1935 and 1939.

The findings of the Commission show that between 1907 and 1935, close to a majority, and in 1931-32, an actual majority, of petitioner's board of directors were directors, officers or employees of Bond and Share or of companies in the Bond and Share system. However, since 1936, the number of Bond and Share affiliates on petitioner's board has been reduced, and some of the members who have remained on the board have resigned from their Bond and Share affiliations.

Of the present 15 directors making up petitioner's board, i. e., as of July, 1940, two, C. E. Groesbeck and Frederick A. Farrar, are directors of Bond and Share, Groesbeck being chairman of the board of both companies and Farrar being retired and inactive; two other members, G. N. Tidd and Henry H. Wehrhane, were directors of acknowledged Bond and Share subsidiaries for many years; Tidd is petitioner's president and a member of its executive committee, and Wehrhane is also a member of petitioner's executive committee; two other members, Frank B. Ball and M. F. Millikan, according to the findings of the Commission "trace their associations, advancement and present status" with petitioner to actions of the board of directors and executive committee in years when these bodies admittedly were under the controlling influence of Bond and Share; two other members, Harrison Williams and J. F. McMillan, have no connection with Bond and Share, but have served petitioner for many years in cooperation with Bond and Share; Williams, the head of the North American Company, has served for more than thirty years on petitioner's board and executive committee and McMillan, petitioner's assistant treasurer, has been employed by petitioner since 1909; for the remaining seven directors the Commission

has not imputed any responsiveness to Bond and Share's desires; of the seven, one is a vice president working on financing, three represent substantial holdings of petitioner's stock, two are incapacitated and inactive, and one is newly appointed.

Of petitioner's executive committee, the Commission found that from 1910 to 1936 a clear majority were directors of Bond and Share or acknowledged subsidiaries in the Bond and Share system. In 1940, after some of petitioner's directors had resigned from Bond and Share affiliations, only one member of petitioner's executive committee was affiliated with Bond and Share. Petitioner's present executive committee as shown by the record consists of Groesbeck, Bond and Share's chief executive, as chairman, Tidd and Wehrhane, recently resigned from Bond and Share affiliations, Williams, head of the North American Company, who has served on petitioner's executive committee since its organization, and Cresswell, representing a large holding of petitioner's stock.

*Financing.* For 25 years, from 1906 to approximately 1932, Bond and Share as petitioner's fiscal agent conducted all the financing operations for petitioner and its subsidiaries. Petitioner concedes that during this period Bond and Share exercised a "controlling influence" over petitioner's management and policies, but insists that it ended when petitioner took charge of its own financing. Between 1932 and 1937 petitioner engaged in no important financing operations. Since 1937 petitioner and its subsidiaries have completed refinancing operations involving the sale of $250,500,-000 of securities to underwriters without the aid of Bond and Share. Petitioner has used the same investment houses for syndicate leaders as have been used by Bond and Share before and since 1932. Much of the legal work for petitioner's refinancing operations was done by members of the staff of Bond and Share's general counsel. Until 1938, petitioner and Bond and Share employed the same law firm as general counsel.

The record shows that Bond and Share was well compensated for its services as petitioner's fiscal agent prior to 1932. During the period between 1920 and 1932 Bond and Share received more than $2,000,000 for these services. Between 1907 and 1928 Bond and Share made numerous unsecured loans to petitioner and between 1921 and

1930 petitioner made many loans to acknowledged subsidiaries of Bond and Share.

*Bond and Share's stock ownership.* Between 1907 and 1929 Bond and Share owned approximately 9.7 per cent of petitioner's outstanding voting securities. In 1929 and 1930 Bond and Share's holdings increased to 17.51 per cent. These holdings constitute Bond and Share's most important investment and its chief source of income. In 1939 Bond and Share derived 47.5 per cent of its total income from this investment in petitioner's common stock.

None of petitioner's other shareholders, who number almost 20,000, or any organized group, owns as much as four per cent of its voting stock. For many years Bond and Share's holdings have accounted for approximately 25 per cent of all the votes cast at petitioner's stockholders' meetings.

The record shows that the 27 largest shareholders of petitioner's voting stock, including Bond and Share, own a total of 1,853,498 shares. Some of this group are represented on petitioner's board of directors. Excluding Bond and Share's 846,985 shares, the remaining 26 members of this group hold 1,006,513 shares. Petitioner argues that should a proxy fight occur it can be assumed that this group would vote with petitioner's management against Bond and Share. It is not necessary to speculate who would get control of the proxies in such a case. The evidence does not show anything but friendliness and cooperation between the managements of the two companies. There is no evidence that there has ever been a proxy fight in petitioner's history. Moreover, included in this group of 26 largest stockholders are shareholders who are admittedly Bond and Share men. Thus petitioner's largest stockholder, other than Bond and Share, is Mitchell, former chairman of the board of Bond and Share, who together with his wife owns 160,710 shares or 3.3 per cent of petitioner's voting stock. This makes it all the more impossible to speculate by inference that the nine directors who own or vote approximately four per cent of petitioner's stock or the group of 26 stockholders might combine to outvote Bond and Share at meetings of directors and stockholders. The very fact that it would take such a large and organized group of petitioner's 20,000 stockholders to outvote Bond and Share shows Bond and Share's substantial position in holding such a large single block of petitioner's voting securities.

Of the number of shares voted at the stockholders' meetings since 1927, more than 95 per cent have been cast by proxy. Bond and Share has always sent its proxies to petitioner's proxy committees. From 1923 to 1938, every member of petitioner's proxy committees was either an officer or a director of Bond and Share or of one of its acknowledged subsidiaries. In 1940, Tidd having resigned from his Bond and Share affiliations, no member of petitioner's proxy committee had any formal Bond and Share affiliations.

*Maintenance of separate managerial and operating staffs.* Prior to 1935 Bond and Share rendered, for compensation, operating services to its acknowledged subsidiaries. Since 1935 a wholly-owned subsidiary, Ebasco Services, Inc., has continued to perform these services. However, neither Bond and Share nor Ebasco has ever rendered any operating services to petitioner and its subsidiaries. Petitioner has itself performed these services for its own holding company system.

The Commission considered these matters primarily of "local concern" and gave as a reason that at the time of petitioner's organization it had its own operating staff which had been taken over from the Electric Company of America.

*Petitioner's "direct contemporary evidence" showing that neither its management nor its policies are "presently subject" to a controlling influence of Bond and Share.* Petitioner offered evidence to show that the filing of a formal plan by petitioner under Section 11(e) of the Act was effected in opposition to Groesbeck and other members of the Bond and Share management. The evidence shows that in response to a letter from the Chairman of the Commission requesting all registered holding companies to submit suggestions, even though they might be tentative, for compliance with Section 11 of the Act, petitioner prepared a formal plan as an application for integration under 11(e), while Bond and Share proposed to submit only tentative proposals for the integration of its system and included petitioner's properties in these proposals.

At a conference in October, 1938, between the officers of the two companies, the president of Bond and Share stated its position that it would be unwise to submit a formal plan and urged the officers of the petitioner to abandon their intention of filing a formal plan. But petitioner's

officers expressed their conviction that a plan under Section 11(e) was a sound and appropriate course for petitioner to pursue. The formal plan was thereafter filed with the Commission. A second incident in connection with petitioner's 11(e) plan occurred at a meeting of petitioner's executive committee in November, 1939, about a year after the plan had been filed. At this meeting Groesbeck urged petitioner's officers to withdraw the Section 11(e) plan and file only an informal plan as other holding companies were doing. Petitioner's attorney expressed his opinion that it had not been a mistake to file the Section 11(e) plan and that, even though the question might be debated, it would be a serious mistake to attempt to withdraw the plan.

Petitioner argues that here was a "direct contemporaneous" attempt by Bond and Share to exert its influence to control petitioner's integration policy and the attempt failed. "And Bond and Share, itself impotent of controlling influence over petitioner, is asking the Commission to help it force petitioner into the Bond and Share program." Bond and Share included petitioner's properties in its integration proposals.

The Commission stated that this matter was not the subject of any substantial controversy between petitioner and Bond and Share. The resolution authorizing the filing of petitioner's formal plan under Section 11(e) was unanimously adopted by petitioner's board of directors, without a dissenting vote by Groesbeck or Farrar, the representatives of Bond and Share on petitioner's board. Also, at the time of the consideration of petitioner's plan, petitioner had filed its application for an order declaring it not to be a subsidiary of Bond and Share and the resolution authorizing this application also was adopted by a unanimous vote of petitioner's board of directors.

Another material contention between petitioner and the Commission is over the differences in the substance of petitioner's formal plan and Bond and Share's tentative proposals for the integration of petitioner's companies. Petitioner argues that Bond and Share is attempting to retain petitioner's properties in the Bond and Share system by its proposals for integration. Bond and Share's program calls for "changes in ownership of property, exchanges, sales, purchases and so forth" in each of the proposed property groups built around "the four principal holding companies," one of which is petitioner. The Commission's view of petitioner's formal plan and Bond and Share's tentative proposals is that there is no material difference in the substance of the two plans. "Under both proposals, if the Commission were to accept the plans, as filed, petitioner and its system would remain substantially unchanged."[9]

The court's function, after consideration of the factual data set out above, is to ascertain whether the Commission's order dismissing petitioner's application, and thereby refusing to declare petitioner not subject to a "controlling influence" of Bond and Share and not a subsidiary of Bond and Share under Section 2(a) (8) (B) of the Act, is supported by substantial evidence.[10] There is no disagreement as to the basic facts. Petitioner's position is that the Commission's conclusions are based entirely on "past relationships," which are not sustained by substantial evidence when faced with details of the present situation.

The issue posed by the statute's negative is whether the evidence is of such a compelling character as to have required

---

[9] On appeal, the Commission has made much of the admission in the famous Bond and Share case that petitioner was a subsidiary of Bond and Share and not entitled to exemption as a subsidiary under the terms of Section 2(a) (8) of the Act. The admission was prepared in 1936 and was included in the answer and cross bill. See Securities and Exchange Commission v. Electric Bond and Share Co., D.C.S.D.N.Y.1937, 18 F.Supp. 131, affirmed 2 Cir., 1937, 92 F.2d 580, affirmed 1938, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105. The Commission stated in its opinion, Holding Company Act Release No. 2749, p. 26,

n. 59, "Although we do not consider that the statement, made in 1936 in another proceeding, is conclusive here, we, nevertheless, regard it as having some measure of significance with relation to the issues here presented." Since the evidence sustains the Commission's conclusions, we deem it unnecessary to consider the significance to be given petitioner's admission in the answer in the Bond and Share case.

[10] Section 24(a) [15 U.S.C. § 79x]: "The findings of the Commission as to the facts, if supported by substantial evidence, shall be conclusive."

the Commission to find that petitioner's management and policies are not subject to a "controlling influence" of Bond and Share. The record may be such as to sustain either a negative or an affirmative finding by the Commission. Kansas City Power & Light Co. v. National Labor Relations Board, 8 Cir., 1940, 111 F.2d 340, 349. The judicial function is exhausted when there is found a rational basis for the conclusions of the Commission after a fair and adequate hearing.[11] Although the initial burden is on petitioner to prove to the Commission that its management and policies are not subject to Bond and Share's "controlling influence," the Commission's function is to make an adequate and fair appraisal of the weight and credibility of the evidence.[12]

As the Commission has stated in H. M. Byllesby & Company, 1940, 6 S.E.C. 639, 651, "it seems clear that Congress meant by the term 'controlling influence' something less in the form of influence over the management or policies of a company, than 'control' of a company." While the existence of "control" constitutes an absolute bar under clauses (i) and (ii) of Section 2(a) (8) (B) for declaring a company not to be a subsidiary, attached to the phrase "subject to a controlling influence" is "so as to make it necessary or appropriate *in the public interest* or for the protection of investors or consumers that the applicant be subject to the obligations, duties, and liabilities imposed in this chapter upon subsidiary companies of holding companies."[13] (Italics supplied.) As "control" may take many different forms, so may "controlling influence,"[14] and the statute is intended to cover any form or device, which may be "pursuant to an arrangement or understanding with one or more other persons."[15] In clause (iii) Congress has enacted an extensible formula that can be applied to "meet the varied and subtle forms which corporate interrelationships have in the past and will in the future take."[16] It is intended to provide a broad sphere for the Commission's determinations in order to

---

[11] Rochester Telephone Corp. v. United States, 1939, 307 U.S. 125, 146, 59 S.Ct. 754, 83 L.Ed. 1147; Gray v. Powell, 1941, 314 U.S. 402, 411, 62 S.Ct. 326, 86 L.Ed. 301; Public Service Corp. of New Jersey v. Securities and Exchange Commission, 3 Cir., 1942, 129 F.2d 899, 903.

[12] Detroit Edison Co. v. Securities and Exchange Commission, 6 Cir., 1941, 119 F.2d 730, 736; Pacific Gas & Electric Co. v. Securities and Exchange Commission, 9 Cir., 1942, 127 F.2d 378, 382; Public Service Corp. of New Jersey v. Securities and Exchange Commission, 3 Cir., 1942, 129 F.2d 899, 902. The Commission, like other expert agencies dealing with specialized fields, has the function of appraising conflicting and circumstantial evidence and the weight and credibility of testimony. National Labor Relations Board v. Link-Belt Co., 1941, 311 U.S. 584, 597, 61 S.Ct. 358, 85 L.Ed. 368; Rochester Telephone Corp. v. United States, 1939, 307 U.S. 125, 146, 59 S.Ct. 754, 83 L.Ed. 1147.

[13] Cf. H. M. Byllesby & Company, 1940, 6 S.E.C. 639, 651.

[14] See, e. g., Detroit Edison Co. v. Securities and Exchange Commission, 6 Cir., 1941, 119 F.2d 730, 739; Pacific Gas & Electric Co. v. Securities and Exchange Commission, 9 Cir., 1942, 127 F.2d 378; Moreau Manufacturing Corp., Holding Company Act Release No. 2868, July 9, 1941; Paul Smith's Hotel Co., Holding Company Act Release No. 2854, July 1, 1941; Panhandle Eastern Pipe Line Co., Holding Company Act Release No. 2778, May 28, 1941; Public Service Corp. of New Jersey, Holding Company Act Release No. 2998, Sept. 15, 1941, petition denied, 3 Cir., 1942, 129 F.2d 899; Hartford Gas Co., 1941, 8 S. E.C. 758, petition denied, 2 Cir., 1942, 129 F.2d 794; Community Gas and Power Co., 1940, 7 S.E.C. 643; Shinn & Co., 1940, 7 S.E.C. 333; Manchester Gas Co., 1940, 7 S.E.C. 57; H. M. Byllesby & Co., 1940, 6 S.E.C. 639; Northern Natural Gas Co., 1939, 5 S.E.C. 228; Associated General Utilities Co., 1939, 4 S.E.C. 526; Employees Welfare Association, Inc., 1939, 4 S.E.C. 792.

Actual "control" may exist under circumstances other than the ownership of a majority of voting stock. See, e. g., United States v. Union Pacific R. R., 1912, 226 U.S. 61, 95, 33 S.Ct. 53, 57 L. Ed. 124; Natural Gas Pipeline Co. v. Slattery, 1937, 302 U.S. 300, 307, 58 S. Ct. 199, 82 L.Ed. 276; Hyams v. Calumet & Hecla Mining Co., 6 Cir., 1915, 221 F. 529, 541; Globe Woolen Co. v. Utica Gas & Electric Co., 1918, 224 N. Y. 483, 121 N.E. 378, 379. The Supreme Court has swept aside all rigid and artificial tests of "control" in Rochester Telephone Corp. v. United States, 1939, 307 U.S. 125, 145, 59 S.Ct. 754, 83 L.Ed. 1147.

[15] 15 U.S.C. 79b(a) (8) (B) (iii).

[16] H. R. Rep. No. 1318, 74th Cong., 1st Sess. (1935) 9.

carry out the policies of the Act as expressed in Section 1.[17]

■■ The existence of "controlling influence" is a factual determination to be ascertained in the Commission's expert judgment by the weighing of circumstantial evidence and the drawing of reasonable inferences therefrom.[18] The principal factors in determining this from the special circumstances of each case for the statutory exemption are the size and extent of the companies involved, the extent of the intercompany relationships, the ownership and distribution of securities, and the parent company's part in the organization and development of the subsidiary company together with the past relationships and, because of the public interest and purposes of the Act involved, consideration must be given to the relationship of charges between the two companies for financing, service and construction contracts, etc.[19]

In brief recapitulation of the evidence, we find on one side Bond and Share's ownership of 17.51 per cent of petitioner's voting stock, from which the former derived 47.5 per cent of its total income in 1939; ownership of petitioner's voting stock widely scattered among approximately 20,000 shareholders so that, other than Bond and Share, no one person or group of persons owns more than four per cent, and the next largest block, 3.3 per cent, is held by Mitchell, life-long official and leading figure, until his retirement, in Bond and Share, and his wife; Bond and Share's voting of approximately 25 per cent of the total number of shares voted at petitioner's stockholders meetings, and doing so as late as 1940 by turning its proxies over to petitioner's proxy committee; intercompany directorships, the chairman of petitioner's board of directors and executive committee being the chairman of Bond and Share's board of directors and executive committee; and the long historical relationship between petitioner and Bond and Share in petitioner's organization, development and management.

On petitioner's side we find Bond and Share's relinquishment of its control as petitioner's fiscal agent; the resignation from Bond and Share affiliations by petitioner's directors and members of its executive and proxy committees; that neither Bond and Share nor its wholly-owned subsidiary, Ebasco Services, Inc., has ever provided operating services for the American Gas system; that construction and group purchase contracts with the Bond and Share system ended in 1932; that many Bond and Share men have resigned from petitioner's board until only two with formal connections remain and only one is active; and the evidence of conflict between the management of petitioner and Bond and Share over petitioner's filing of a formal plan for its integration under Section 11(e) of the Act.

■ Without doubt these facts constitute a weakening of the formal evidences of control and, it may be conceded, a contraction in the extent to which it has been exercised in fact. But they cannot be taken conclusively as a corporate "declaration of independence" or as sufficient to establish such independence as fait accompli. The period of dependence was too long, the separation from influence too inconclusive, to establish as a matter of law that petitioner no longer occupies a state of dependency. The facts do not remove entirely either the existence of "controlling influnce" or the possibility of Bond and Share's exercising a "latent power" to control, should business conditions make it appropriate. Cf. Detroit Edison Co. v. Securities and Exchange Commission, 6 Cir., 1941, 119 F.2d 730, 739. Under some circumstances "controlling influence may spring as readily from advice constantly sought as from command arbitrarily imposed." Manchester Gas Co., 1940, 7 S.E.C. 57, 62. It is the Commission's duty to see that divestment of "controlling influence" is actual and complete, not theoretical or partial. International Paper & Power Co., 1937, 2 S.E.C. 274, 278, rev'd on juris-

---

[17] Cf. Electric Bond & Share Co. v. Securities and Exchange Commission, 1938, 303 U.S. 419, 441, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105; Burco, Inc., v. Whitworth, 4 Cir., 1936, 81 F.2d 721, 734, certiorari denied 1936, 297 U.S. 724, 56 S.Ct. 670, 80 L.Ed. 1008; Detroit Edison Co. v. Securities and Exchange Commission, 6 Cir., 1941, 119 F.2d 730; Securities and Exchange Commission v.

Associated Gas & Electric Co., D.C.S.D. N.Y.1938, 24 F.Supp. 899, 902, affirmed 2 Cir., 1938, 99 F.2d 795.

[18] Rochester Telephone Corp. v. United States, 1939, 307 U.S. 125, 145, 59 S.Ct. 754, 83 L.Ed. 1147. See note 14 supra.

[19] Detroit Edison Co. v. Securities and Exchange Commission, 6 Cir., 1941, 119 F.2d 730, 739. Cf. cases cited in note 14 supra.

dictional grounds, Lawless v. Securities and Exchange Commission, 1 Cir., 1939, 105 F.2d 574. Controls and influences exercised for so long and so extensively as were Bond and Share's over petitioner are not severed instantaneously, sharply and completely, especially when powers of voting, consultation and influence such as have been retained remain. Petitioner may have advanced, in the terminology of empire, from status as dependency or colony to one of a dominion, but it has not become an independent empire as a matter of law.

■ Giving due weight to the past relationships of petitioner and Bond and Share and the other evidences of Bond and Share's present position of authority and influence in petitioner's management and stock ownership, we cannot say that the inferences drawn therefrom by the Commission to find "a personnel and tradition" which make petitioner responsive to Bond and Share's desires are unreasonable.[20] The Commission therefore committed no error in denying petitioner exemption from the Act as a subsidiary of Bond and Share.[21] That Bond and Share has recently abandoned some characteristics of "controlling influence" did not require the Commission to disregard the past relationships between the two companies.[22]

The Commission's finding that the "controlling influence" is such "as to make it necessary or appropriate in the public interest or for the protection of investors or consumers" must likewise be upheld.[23]

---

[20] Compare these facts with the following cases in which "controlling influence" has been found to exist: The Detroit Edison Co., 1940, 7 S.E.C. 968, petition denied, Detroit Edison Co. v. Securities and Exchange Commission, 6 Cir., 1941, 119 F.2d 730; Pacific Gas & Electric Co., Holding Company Act Release No. 2988, Sept. 11, 1941, petition denied, Pacific Gas & Electric Co. v. Securities and Exchange Commission, 9 Cir., 1942, 127 F.2d 378; The Hartford Gas Co., 1941, 8 S.E.C. 758, petition denied, 2 Cir., 1942, 129 F.2d 794; Manchester Gas Co., 1940, 7 S.E.C. 57; Shinn & Co., 1940, 7 S.E.C. 333; H. M. Byllesby & Co., 1940, 6 S.E.C. 639; Associated General Utilities Co., 1939, 4 S.E.C. 526; Panhandle Eastern Pipe Line Co., Holding Company Act Release No. 2778, May 28, 1941; Paul Smith's Hotel Co., Holding Company Act Release No. 2854, July 1, 1941, with the following cases in which the Commission has found that no "controlling influence" exists: Bridgeport Gas Light Co., 1940, 8 S.E.C. 295; Reading Gas Co., 1940, 7 S.E.C. 755; Lehigh Power Securities Corp., 1939, 5 S.E.C. 143; The Cleveland-Cliffs Iron Co., 1938, 3 S.E.C. 326, 333; Boise Gas Light and Coke Co., 1937, 2 S.E.C. 269.

[21] The issue presented in a proceeding under Section 2(a) (8) (B) of the Act is "whether or not there is control or susceptibility to controlling influences *in fact*, and does not merely relate to the percentage of voting securities held. It has frequently been a most troublesome question, necessitating the most thorough exploration of historical and potential relationships between the companies involved." See Engineers Public Service Co., Holding Company Act Release No. 2897, July 24, 1941, p. 35.

[22] The Commission has construed "subject to a controlling influence" to include "susceptibility to domination." The Detroit Edison Co., 1940, 7 S.E.C. 968, 970; Bridgeport Gas Light Co., 1940, 8 S.E.C. 295, 297; Hartford Gas Co., 1941, 8 S.E. C. 758, 766. This construction has been upheld by the courts, Pacific Gas & Electric Co. v. Securities and Exchange Commission, 9 Cir., 1942, 127 F.2d 378, 382, 391; Public Service Corp. of New Jersey v. Securities and Exchange Commission, 3 Cir., 1942, 129 F.2d 899, 903; Detroit Edison Co. v. Securities and Exchange Commission, 6 Cir., 1941, 119 F.2d 730, 738. See Note (1942) 56 Harv.L.Rev. 100. And even if the action of the Commission is favorable for exemption, the nonexistence of "controlling influence" may be only conditional and temporary. Engineers Public Service Co., Holding Company Act Release No. 2897, July 24, 1941, p. 35; Panhandle Eastern Pipe Line Co., Holding Company Act Release No. 2778, May 28, 1941, p. 1 of the Order.

[23] In some cases the Commission has exempted subsidiaries, even though "controlling influence" was found to exist, when it was not "necessary or appropriate in the public interest" to subject the company to the Commission's regulatory jurisdiction as a subsidiary. E. g., Wisconsin Valley Improvement Co., 1940, 8 S.E.C. 134, 138. For cases of the difference in the weight to be given the "public interest," cf., e. g., Employees Welfare Ass'n, Inc., 1939, 4 S.E.C. 792, 796; Community Gas and Power Co., 1940, 7 S.E.C. 643, 645; Utilities Employees Securities Co., 1939, 4 S.E.C. 806, 809. Even though exemption is granted, it may be on certain conditions. See Genesee Valley Gas Co., Inc., 1938, 3 S.E.C. 672, 677; Cresson Electric Light Co., 1936, 1 S.E.C. 379, 381.

Bond and Share's relationship to petitioner goes much beyond that of a single investor in petitioner's securities.[24] This relationship has been secured by a disproportionately small investment. There is evidence also of large write-ups of petitioner's properties while admittedly under Bond and Share's "controlling influence."

But Section 2(a) (8) does not require findings of the evils enumerated in Section 1 of the Act.[25] Nor does the statutory formula require findings that the relationship of the parent and subsidiary in the conduct of the subsidiary has affected or will affect the public adversely.[26] The statute contemplates that the Commission will exercise its control prospectively in a field of important economic activities.[27] In order to do this the Commission has been granted broad powers in this field, and when these have been exercised properly its action must be upheld by the courts.[28] We find that the Commission has properly performed its function. The petition to set aside the Commission's order is therefore denied, and the order of the Commission must be affirmed.

It is so ordered.

STEPHENS, Associate Justice (dissenting).

Section 2(a) (8) of the Public Utility Holding Company Act of 1935, 49 Stat. 807, 15 U.S.C.A. § 79b, provides:

". .. . The Commission, upon application, shall by order declare that a company is not a subsidiary company of a specified holding company under clause (A) [which clause makes a subsidiary any company 10 per centum or more of whose outstanding voting securities are owned, controlled, or held with power to vote, by a holding company] if the Commission finds that (i) the applicant is not controlled, directly or indirectly, by such holding company (either alone or pursuant to an arrangement or understanding with one or more other persons) either through one or more intermediary persons or by any means or device whatsoever, (ii) the applicant is not an intermediary company through which such control of another company is exercised, and (iii) the management or policies of the applicant are not *subject to a controlling influence,* directly or indirectly, by such holding company (either alone or pursuant to an arrangement or understanding with one or more other persons) so as to make it necessary or appropriate in the public interest or for the protection of investors or consumers that the applicant be subject to the obligations, duties, and liabilities imposed in this title upon subsidiary companies of holding companies. . . . As a condition to the entry of, and as a part of, any order granting such application, the Commission may require the applicant to apply periodically for a renewal of such order and to file such periodic or

---

[24] Petitioner is a registered holding company and, as such, is subject to the regulatory jurisdiction of the Commission. This fact does not prevent its being "necessary and appropriate in the public interest" to subject petitioner to the Commission's regulatory jurisdiction as a subsidiary of Bond and Share, since the protection of the "public interest" is not the same in the two situations. Also, the status of the petitioner may be of importance to the integration of petitioner's system under Section 11 of the Act.

[25] "The purpose of the statute is not to punish abuse, but to prevent its occurrence. Both 'good' and 'bad' public utility holding companies, within the ambit of federal power are subject to the provisions of the Act in order to guard against certain evils. * * *" Houston Natural Gas Corp., 1938, 3 S.E.C. 664, 669; Manchester Gas Co., 1940, 7 S.E.C. 57, 62.

[26] "If the 'controlling influence' is sufficiently extensive to embrace the power to bring about the evils that the Act is

designed to guard against, the statutory standard under Section 2(a) (8) is satisfied." Manchester Gas Co., 1940, 7 S.E. C. 57, 62.

[27] Cf. Chenery Corp. v. Securities and Exchange Commission, 1942, 75 U.S.App. D.C. 374, 128 F.2d 303, 315, certiorari granted 63 S.Ct. 52, 87 L.Ed. ——.

[28] Rochester Telephone Corp. v. United States, 1939, 307 U.S. 125, 139, 145, 59 S.Ct. 754, 83 L.Ed. 1147; Mississippi Valley Barge Line Co. v. United States, 1934, 292 U.S. 282, 286, 54 S.Ct. 692, 78 L.Ed. 1260; Federal Communications Commission v. Pottsville Broadcasting Co., 1940, 309 U.S. 134, 144, 145, 60 S.Ct. 437, 80 L.Ed. 656; Board of Trade of Kansas City v. United States, 1942, 314 U.S. 534, 546, 547, 62 S.Ct. 366, 86 L.Ed. 432; Scripps-Howard Radio, Inc., v. Federal Communications Commission, 1942, 316 U.S. 4, 10, 62 S. Ct. 875, 86 L.Ed. 1229; United States v. Morgan, 1941, 313 U.S. 409, 422, 61 S. Ct. 999, 85 L.Ed. 1429.

special reports regarding the affiliations or intercorporate relationships of the applicant as the Commission may find necessary or appropriate to enable it to determine whether in the case of the applicant the conditions specified in clauses (i), (ii), and (iii) are satisfied during the period for which such order is effective. The Commission, upon its own motion or upon application, shall revoke the order declaring such company not to be a subsidiary company whenever in its judgment any condition specified in clause (i), (ii), (iii) is not satisfied in the case of such company, or modify the terms of such order whenever in its judgment such modification is necessary to ensure that in the case of such company the conditions specified in clauses (i), (ii), and (iii) are satisfied during the period for which such order is effective. . . ." [Italics supplied]

The question in this case is whether or not, within the meaning of this Act, American Gas and Electric Company (hereinafter called American Gas) is a subsidiary of Electric Bond and Share Company (hereinafter called Bond and Share).[1] The Commission found "that the facts . . . show past relationships between applicant [American Gas] and Bond and Share which clearly 'have resulted in a personnel and tradition' which make applicant responsive to Bond and Share's desires . . . ." The Act provides in Section 24(a), 15 U.S.C.A. § 79x, that "The findings of the Commission as to the facts *if supported by substantial evidence, shall be conclusive."* (Italics supplied) American Gas contends that there is no substantial evidence to support the finding that the Commission made and that on the contrary substantial evidence shows, and the Commission should have found, that the "management or policies" of American Gas "are not subject to a controlling influence, directly or indirectly," by Bond and Share and that it is therefore not a subsidiary of the latter.[2]

This finding the Commission declined to make.

In determining the questions of fact in this case the Commission as trier of fact must, properly, have taken two steps: one, determination, from consideration of the evidence, of the underlying or subsidiary (sometimes referred to as the basic) facts in the case; the other, determination from such facts of the question whether the ultimate facts alleged have been established. And, under the system of law guaranteed by our Constitution, the subsidiary facts must be reached from the evidence and the ultimate facts from the subsidiary facts, not arbitrarily or by assumption or conjecture or by a process contrary to reason, but according to reason. Although, as said in National Labor Relations Board v. Pennsylvania Greyhound Lines, 1938, 303 U.S. 261, 271, 58 S.Ct. 571, 82 L. Ed. 831, 115 A.L.R. 307, inferences are to be drawn by the trier of fact and not by the courts, the inferences must nevertheless be reasoned inferences. And it is the duty of the reviewing tribunal to see that they are, otherwise the case is not decided according to law. "The primary question presented for our determination is whether or not the findings of the Board find support in the record and are not arbitrary and capricious." Union Drawn Steel Co. v. National Labor Relations Board, 3 Cir., 1940, 109 F.2d 587, 589. Under the Federal rule findings must be supported by substantial evidence, and substantial evidence is "more than a scintilla and must do more than create a suspicion of the existence of the fact to be established." National Labor Relations Board v. Columbian Enameling & Stamping Co., 1939, 306 U.S. 292, 300, 59 S.Ct. 501, 83 L. Ed. 660. In Consolidated Edison Company v. National Labor Relations Board, 1938, 305 U.S. 197, 229, 230, 59 S.Ct. 206, 83 L. Ed. 126, the Supreme Court put it thus:

". . . the statute, in providing that "the findings of the Board as to the facts if

[1] American Gas is itself a registered holding company under the Act, and as such it and its subsidiaries are subject to the provisions of the Act and to the jurisdiction of the Commission affecting holding companies and their subsidiaries. The case involves, therefore, no question as to this regulated status of American Gas and its system. American Gas seeks recognition and declaration that it is not a subsidiary of Bond and Share so that the provisions of the Act and the Commission's orders to effectuate them shall, as to American Gas, be directed to it and its system separately and not as a part of the larger and more complicated system of Bond and Share.

[2] The Commission does not contend that American Gas is "controlled" by Bond and Share within the meaning of that word in clause (i) of Section 2(a) (8), (B), or that it is "an intermediary company" within the meaning of clause (ii).

646

supported by evidence, shall be conclusive," means supported by substantial evidence. Washington, V. & M. Coach Co. v. National Labor Relations Board, 1937, 301 U.S. 142, 147, 57 S.Ct. 648, 81 L.Ed. 965. Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. [Citing authorities] . . .

". . . desirable flexibility in administrative procedure does not go so far as to justify orders without a basis in evidence having rational probative force. . . ."

In the instant case the subsidiary or basic facts are undisputed; the dispute in the case is concerning their meaning. Therefore the question before us on this review of the correctness of the Commission's findings is whether or not the inference drawn by the Commission that the facts show past relationships between American Gas and Bond and Share which clearly have resulted in a personnel and tradition which make it responsive to Bond and Share's desires is a reasonable inference, or whether the Commission should reasonably have inferred and found that the "management or policies" of American Gas "are not subject to a controlling influence" by Bond and Share and that it is hence not a subsidiary of the latter.[3]

---

[3] To safeguard the integrity of findings of ultimate fact arrived at by inference, the law has established certain principles with reference to the dependability of inferences: (1) An inference to be reasonable must be warranted from all the evidence, otherwise a fact reasonably inferable from a single fact or group of facts might be inconsistent with the totality of proven or conceded subsidiary facts. As said in National Labor Relations Board v. Union Pacific Stages, Inc., 9 Cir., 1938, 99 F.2d 153, 177, where the court interpreted the meaning of Section 10(e) of the National Labor Relations Act, 29 U. S.C.A. § 160(e), providing that "the findings of the Board as to the facts, if supported by evidence, shall be conclusive": "But the courts have not construed this language as compelling the acceptance of findings arrived at by accepting part of the evidence and totally disregarding other convincing evidence." In short, a trier of fact may not ignore a part of the evidence. In National Labor Relations Board v. Thompson Products, Inc., 6 Cir., 1938, 97 F.2d 13, 15, the court said in respect of Section 10(e) of the Act: "It means that the one weighing the evidence takes into consideration all the facts presented to him and all reasonable inferences, deductions and conclusions to be drawn therefrom and, considering them in their entirety and relation to each other, arrives at a fixed conviction. . . . Testimony is the raw material out of which we construct truth, and, unless all of it is weighed in its totality, errors will result and great injustices be wrought."

(2) If two equally probable but inconsistent inferences may be drawn from the same facts, a finding of fact cannot reasonably be based upon either of them; in such a situation the evidence is equivocal. Pennsylvania Railroad Co. v. Chamberlain, Administratrix, 1933, 288 U.S.

333, 53 S.Ct. 391, 77 L.Ed. 819. In that case the Court said: "We, therefore, have a case belonging to that class of cases where proven facts give equal support to each of two inconsistent inferences; in which event, neither of them being established, judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other, before he is entitled to recover [citing authorities]." (288 U.S. at page 339, 53 S.Ct. at page 393, 77 L.Ed. 819). See also Cupples Co. Manufacturers v. National Labor Relations Board, 8 Cir., 1939, 106 F.2d 100. As illustrated in that case: "The evidence that the Company welcomed the organization of an independent union of its employees and preferred such a union to any other, and made haste to recognize the Association as the sole bargaining representative for all of its employees, is not a sufficient factual basis for the finding of interference, domination and support. This for the reason that, while such evidence is consistent with the hypothesis that the formation and administration of the independent union was interfered with, dominated and supported by the Company, it is not inconsistent with the contrary hypothesis, and therefore supports neither." (106 F.2d at page 114)

(3) Where two different inferences may be drawn from undisputed facts, that which is the more probable is the one which must be drawn. National Labor Relations Board v. Sands Mfg. Co., 1939, 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682; Appalachian Electric Power Co. v. National Labor Relations Board, 4 Cir., 1938, 93 F.2d 985.

(4) A fact may not be inferred from a proven fact or facts where unimpeached and uncontradicted testimony consistent with such proven fact or facts but inconsistent with the fact sought to be in-

But before the question of the sufficiency of the evidence to support the findings in the instant case can be determined the meaning of the phrase "subject to a controlling influence" as used in the statute must be ascertained. Here I am unable to agree with the construction of this phrase in the cases relied on in the majority opinion. It was held in Detroit Edison Co. v. Securities and Exchange Commission, 6 Cir., 1941, 119 F.2d 730, 739, that the phrase "means the act or process, or power of producing an effect which may be without apparent force or direct authority and is effective in checking or directing action, or exercising restraint or preventing free action. The phrase as here used does not necessarily mean that those exercising controlling influence must be able to carry their point. A controlling influence may be effective without accomplishing its pur-

pose fully." This construction was accepted in Public Service Corp. v. Securities and Exchange Commission, 3 Cir., 1942, 129 F.2d 899. In Pacific Gas & Electric Co. v. Securities and Exchange Commission, 9 Cir., 1942, 127 F.2d 378, the view of the court (Garrecht, J., dissenting) was that "subject to a controlling influence" meant mere susceptibility to a controlling influence and that in addition to the conditions specified in clauses (i), (ii) and (iii) of the statute there was a fourth and independent condition in view of which the Commission might find that an applicant was a subsidiary if the Commission thought merely that it was necessary or appropriate in the public interest or for the protection of investors or consumers that the applicant be subject to the obligations, duties and liabilities of the Act upon subsidiary companies of holding companies.[4]

---

ferred, is in the record. Pennsylvania Railroad Co. v. Chamberlain, Administratrix, supra; Cupples Co. Manufacturers v. National Labor Relations Board, supra; Foote Bros. Gear & Machine Corporation v. National Labor Relations Board, 7 Cir., 1940, 114 F.2d 611. This proposition was phrased as follows in the Pennsylvania Railroad case: "And the desired inference is precluded for the further reason that respondent's right of recovery depends upon the existence of a particular fact which must be inferred from proven facts, and this is not permissible in the face of the positive and otherwise uncontradicted testimony of unimpeached witnesses consistent with the facts actually proved, from which testimony it affirmatively appears that the fact sought to be inferred did not exist. . . . A rebuttable inference of fact, as said by the court in the Wabash Railroad case [Wabash R. Co. v. De Tar, 8 Cir., 1905, 141 F. 932, 935, 4 L.R.A., N.S., 352], 'must necessarily yield to credible evidence of the actual occurrence.' And, as stated by the court in George v. Missouri Pac. R. Co. . . . [1923, 213 Mo.App. 668, 674, 251 S.W. 729, 732], "It is well settled that where plaintiff's case is based upon an inference or inferences, . . . the case must fail upon proof of undisputed facts inconsistent with such inferences.' . . ." (288 U. S. at pages 340, 341, 53 S.Ct. at pages 393, 394, 77 L.Ed. 819) In the Cupples Co. Manufacturers case the court stated: "evidence which merely furnishes grounds for suspicion and conjecture proves nothing, and . . . the Board, like a jury, may not disregard the uncontradicted testimony of unimpeached and

credible witnesses." (106 F.2d at page 105) In the Foote Bros. Gear & Machine Corporation case the court said: "In reaching our conclusion we wish to make it clear that . . . (c) A statement which alone may afford substantial support for a fact finding may lose its weight entirely in the fact of uncontradicted facts inconsistent with it. . . .." (114 F.2d at page 622)

In short the rules of logic and reasoning which are necessary to the accomplishment of the type of adjudication guaranteed under our system of law must be applied by the Commission, as by any trier of fact, in reaching its findings. Consolidated Edison Company v. National Labor Relations Board, 1938, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. A. S. Abell Co., 4 Cir., 1938, 97 F.2d 951; National Labor Relations Board v. Bell Oil & Gas Co., 5 Cir., 1938, 98 F.2d 406; Cupples Co. Manufacturers v. National Labor Relations Board, supra; Magnolia Petroleum Company v. National Labor Relations Board, 5 Cir., 1940, 112 F.2d 545.

[4] It was persuasively pointed out by Judge Garrecht, dissenting, that such a construction of the Act was not tolerable. He said:

"From the discussion in Congress at the time the Act was under consideration and as well from the fair and ordinary meaning of the language, the phrase 'subject to a controlling influence' does not mean, as the Commission found and the majority opinion determined, that appellant was required to 'demonstrate' that its management and policies were not 'susceptible to control' by North American.

648

"Subject to" means under the power or dominion of another. It is synonymous with subordinate, inferior.[5] "To control" means to exercise restraining or directing influence over; to dominate; regulate; hence, to hold from action; to curb; subject.[6] And "controlling," the present participial form of the verb, therefore means the act or fact of exercising restraining or directing influence over; it conveys the idea of process or continuance. Moreover, the word "influence" itself has a present participial, i. e., present continuing action, connotation.[7] It is defined to mean (as said in the first portion of the quotation from the Detroit Edison case, supra) the act or process, or the power, of producing an effect without apparent force or direct authority. But it is further defined (this was not stated in the Detroit Edison case) to mean influence by suggestion; the influence of heat upon life; hence, a considerable or an ascendant power arising from station, excellence of character or intellect, etc., sway, control, mastery, effect, force.[8] All of the foregoing dictionary definitions are trite but it is seemingly necessary to state them. In view of the common meaning of these words it is a contradiction in terms to say, as in the Detroit Edison case, that "subject to a controlling influence" does "not necessarily mean that those exercising controlling influence must be able to carry their point." How can an influence be controlling, in the normal use of language, which does not control; and how can "subject to a controlling influence" be a mere susceptibility to a controlling influence as held in the Pacific Gas case? I think that Congress in using the word "control" in clause (i) and the phrase "subject to a controlling influence" in clause (iii) of the Act intended to differentiate, not between presently effective control on the one hand and mere susceptibility to control on the other—if it had intended such a distinction it could easily have used apt language to express it —but between two different types of presently effective control. I think that in clause (i) Congress intended to cover control through, so to speak, structural means, such as complete or majority ownership of capital stock, or devices such as combinations of stockholders, voting trusts, majority membership on proxy committees, interlocking corporate officers or directors; I think that by the phrase "subject to a controlling influence" Congress intended to describe such control as might result from the command of one mind over another, or from station or

'Subject to a controlling influence' is not the equivalent of 'susceptible to a controlling influence.' 'Susceptible' and 'subject' are not interchangeable or synonymous terms. The word 'susceptible' connotes an especial liability to mental or emotional impressions. Advisedly that expression was not used in the statute. But the word 'subject' is used, and here it occurs in relation with 'control', and in that sense it can be correctly defined as meaning 'under rule, authority, or domination'. Thus, 'subject to a controlling influence', as stated in the statute, is not the same thing as 'susceptibility' to a controlling influence as expressed by the Commission. One phrase refers to an actually existing state; the other might be applied to express some future condition which uncertain events might possibly bring about. In considering this aspect of the matter it is important to keep in mind that under the statute the Commission is in a position to act at once if ever the susceptibility should become an actuality, even if the Commission had theretofore granted petitioner an exemption at a time when the facts showed a lack of any actual and existing control or controlling influence.

\* \* \*

"In vesting the Commission with the duty of ascertaining 'control' or 'subject to a controlling influence' of one company by another Congress did not imply that a potential facility to exercise control was sufficient to establish such controlling influence. If this alone were sufficient the Congress would not have made provision for the exemption." (127 F.2d at page 391)

In respect of the fourth and independent condition which the majority construed the statute to include, Judge Garrecht added:

"It seems to me that the opinion of the Court has added to the Act by judicial construction conditions not imposed by Congress and by which the Commission has been relieved of the obligation which requires that the findings be sustained by substantial evidence." (127 F.2d at page 392)

[5] See Webster's New International Dictionary (2d ed. 1942) p. 2509, 3d column.
[6] Id. at 580, 3d column.
[7] The word "influence" is the present participial form (influens,-entis) of the Latin verb influo, uxi, uxus, ere, meaning "To stream in, throng in, invade."
[8] See Webster's New International Dictionary (2d ed. 1942) p. 1276, 1st column.

prestige, or from habituation to the policies of another. I think therefore that the phrase "subject to a controlling influence" is fairly to be taken to mean under a presently effective dominion.

The meaning of the phrase "management or policies" as used in the Act must also be borne in mind. By "policy" is meant in the present context a settled or definite course or method adopted and followed by a government, institution, body, or individual.[9] The word "management" may refer to the act or art of managing, the manner of treating, directing, carrying on, or using, for a purpose; conduct, control. It may also mean, however, the collective body of those who manage or direct any enterprise or interest, the board of managers.[10] It is not to be assumed that Congress was using the word "policies" and the word "management" redundantly, and I think, therefore, that the latter meaning of "management" was the one intended.

Turning now to the question what inferences may reasonably be drawn from the basic facts in the instant case: Stated in brief the basic facts from which the ultimate facts are by inference to be reached are the following: American Gas was organized by Bond and Share in 1906 out of Electric Company of America. Of the outstanding voting securities of American Gas 17.51% are owned by Bond and Share; the remaining 82.49% is in the scattered ownership of persons other than Bond and Share; no one of these other stockholders and no organized group thereof owns as much as 4%. Until 1928-1931 Bond and Share, for substantial compensation, as fiscal agent supervised the financial affairs of American Gas; since that period there has been no financial supervision by Bond and Share—American Gas has handled all of its financing independently.[11] From the outset there were common directorships of Bond and Share and American Gas—this reached its highest point in 1926 when 7 out of the 15 members of the board of directors of American Gas were at the same time directors of Bond and Share or of companies in its system; after 1926 the number of common directorships lessened until at the time of the present inquiry (the hearing commenced June 12, 1940, and terminated, in the order of the Commission, May 12, 1941) only 2 members of the board of American Gas are directors of or have any connection with Bond and Share or companies in its system. The same is true of the executive committee of American Gas; 5 out of a membership of 7 were connected with Bond and Share in 1926 but at the present time only 1 is so connected.[12] The two directors of American Gas who are now connected with Bond and Share are Mr. C. E. Groesbeck and Mr. Frederick A. Farrar. Mr. Groesbeck is chairman of the board of both Bond and Share and American Gas and chairman of the executive committee of American Gas, but in such positions in American Gas he is without salary, desk or office. Mr. Farrar is a director of both American Gas and Bond and Share but is in his eighty-sixth year and is retired. Prior to 1938 all of the members of the proxy committee of American Gas were persons who were also directors of Bond and Share or of one of its subsidiaries but in 1939 there was only 1 such, and in 1940 none. There are not now and never have been any common officers of American Gas and Bond and Share or its subsidiaries. Certain of the present directors of American Gas were such during the period when Bond and Share was the fiscal agent for American Gas.[13]

---

9 Id. at 1908, 2d column.

10 Id. at 1492, 3d column.

11 American Gas has apparently made no short term loans since 1928 and there were no public securities offerings between 1931 and 1937 by American Gas or any of its subsidiaries. But since 1937 American Gas for itself and six of its subsidiaries has, without service by or consultation with Bond and Share or Ebasco Services, Inc. (the service subsidiary of Bond and Share), carried through refinancing operations aggregating $250,000,000 in par and face amount.

12 It is to be noted that 2 members of a board of 15 and 1 member of an executive committee of 5 is almost exactly the mathematical representation to which a stockholder holding 17½% of voting securities is entitled. (The executive committee consisted of 7 members in 1926, 5 now.)

13 Mr. G. N. Tidd (with American Gas since formation in 1906).

Mr. Henry H. Wehrhane (on board of directors of American Gas since 1910).

Mr. Harrison Williams (a director of American Gas since 1906).

Mr. Frank B. Ball (a director of American Gas since 1923; originally with the Electric Company of America, he came over into American Gas at its formation).

Prior to 1928 loans were made by Bond and Share to American Gas and by the latter to Bond and Share subsidiaries; but since 1928 American Gas has not been indebted to Bond and Share nor have Bond and Share subsidiaries been indebted to American Gas. From 1912 to 1935 Bond and Share and American Gas were parties to group purchase contracts. From 1910 to 1932 American Gas was a party to a contract with an engineering firm for the rendering of advice, reports and construction services to which contract Bond and Share and one of its subsidiaries were also parties; the fees for services were based on the actual work done for each company. (This engineering service is to be distinguished from the engineering service, referred to below, rendered by American Gas' own staff.) Since 1928 American Gas has continued to use investment and commercial banks, the original connection with most of which was formed in the period prior to 1928 when Bond and Share was acting as fiscal agent for American Gas. American Gas and Bond and Share have never had common auditors. Except in respect of the instant proceeding and a proceeding, referred to below, under Section 11 of the Act, the same law firm has represented and continues to represent Bond and Share and American Gas. In 1936 in pleadings in the case of Securities and Exchange Commission v. Electric Bond and Share Co.,[14] wherein American Gas was a defendant, it joined with several co-defendants in an allegation that they (including American Gas) were "subsidiary companies of the defendant Bond and Share . . . and none of said companies is entitled to exemption or to claim exemption as a subsidiary under the terms of Section 2(a) (8) * * * of said Act." From the outset of its organization American Gas has had its own managerial, operating and engineering staff (segregated in 1938—in compliance with the Public Utility Holding Company Act—into a newly created subsidiary of American Gas, American Gas and Electric Service Corporation); all of the managerial, operating and engineering functions (except for financial service until 1928-1931 as above described) of American Gas and its system have been performed by this staff, and this staff has performed no service for Bond and Share. Shortly after the formation of American Gas, Bond and Share assembled its own complete service staff, now segregated into its service subsidiary, Ebasco Services, Inc. American Gas has never (except for financial service until 1928-1931 as above described) received advice or service from the Bond and Share service staff or from Ebasco Services, Inc., and does not do so at the present time. The techniques of these two separate service staffs developed along different lines; their methods of organization and functioning, engineering practices and commercial policies have presented and now present a definite contrast. The management and policies of American Gas, including the technique of generation, transmission and distribution of electric energy, construction standards, uniformity of practices and operations, retention or non-retention of non-electric utility properties, depreciation policy, rate structure policy, merchandising policy, policy as to extent of investment retained in subsidiaries, and financing (since 1928-1931)—all of these may for convenience be referred to as business and engineering policies—are different from those of Bond and Share; the differences are more explicitly set forth in the margin.[15] In 1938-1939 Bond and Share,

---

Mr. M. F. Millikan (commenced service with American Gas in 1914).

Mr. J. F. McMillan (with American Gas since 1925, commencing as assistant secretary and treasurer).

Mr. Duncan T. Campbell (with American Gas since 1907, when he came to Scranton Electric Company, a wholly owned subsidiary of American Gas).

[14] D.C.S.D.N.Y.1937, 18 F.Supp. 131, affirmed 2 Cir., 1937, 92 F.2d 580, affirmed 1938, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105.

[15] American Gas utilizes large units and high pressures and temperatures in its generation of electric energy while Bond and Share tends more to the use of small units and lower pressures and temperatures.

American Gas utilizes steel in its transmission line construction to a far greater extent than Bond and Share.

American Gas uses power transformers of a lower insulation or voltage class than the actual operating voltage of the transmission line accompanied by lightning protection equipment. The practice on Bond and Share properties is substantially the reverse, those companies using transformers of a voltage or insulation rating considerably above the nominal voltage of the system.

through Mr. Sydney R. Inch its president, attempted to cause Mr. G. N. Tidd, president of American Gas and a member of its board of directors and executive committee, and Mr. Joseph M. Burchill, a vice-president and member of the board, and Mr. M. F. Millikan, a vice-president, house counsel and member of the board, and through them American Gas, to abandon its intention of filing under Section 11 of the Act a formal integration plan of its own, i. e., to comprehend its own system and nothing else. Nevertheless, resolutions to file the in-dependent plan of American Gas and to file the application of American Gas under Section 2(a) (8) to be declared not a sub-sidiary of Bond and Share (the application which resulted in the present proceeding) were adopted by unanimous vote of the board of directors of American Gas, including the vote of Mr. Farrar and Mr. Groesbeck the two directors of American Gas who are also directors of Bond and Share. This episode, as shown by the record, is described in greater detail in the margin.[16] In 1939 Mr. Tidd resigned from

American Gas has a uniform practice on all of its properties for relay protection while Bond and Share properties have no unified practice.

American Gas has a system of standards and specifications which are used regularly by all of its operating companies in the course of their operations. These standards and specifications cover practices in distribution standards, meter standards, safety manuals, material and methods used in line construction, for power transformers, power and control cables, etc. In many of these phases Bond and Share has no corresponding practices which are uniform for all of its subsidiaries.

Companies in the Bond and Share group are divided into groups with a sponsor for each group who acts as a liaison officer between the local companies of the group and the central organization; this type of organization does not exist in the American Gas group, which latter company and its service company have direct contact with its operating subsidiaries.

It has been the policy for years of the American Gas to dispose of properties that supply utility service other than electric service while there are many companies in the Bond and Share group that provide gas and transportation service. In 1930, 98% of the gross revenue of the American Gas group was derived from electric service and in 1939, 99% of the gross revenue was from electric service. Substantial portions of the revenue of the subsidiaries of Bond and Share are derived from services other than electric service.

American Gas has a different policy with respect to merchandizing of electrical appliances from that of the Bond and Share group.

American Gas has a uniform policy with respect to rural electrification while Bond and Share has no such uniform policy.

American Gas has on its properties universally a block type of residence rate and uniform rate structure for commercial and large power consumers while companies in the Bond and Share group have a variety of types of rates.

American Gas furnishes a complete advertising service to its subsidiaries while Bond and Share does not.

Bond and Share furnished supervisory service to its subsidiary companies at a figure higher than cost until 1935 while American Gas has furnished such service to its subsidiaries at cost since 1912 with the exception of construction engineering service which it has furnished at cost since 1932.

American Gas has a different depreciation policy for its subsidiaries than Bond and Share.

It has been the practice of American Gas to retain not only the common stocks but substantial amounts of the bonds and preferred stocks of its operating subsidiaries and, while it has made substantial reductions in its investments in its subsidiaries through sales of bonds and preferred stocks of such subsidiaries, it has at all times maintained and still maintains a substantial investment in such subsidiaries represented by both senior securities and common stocks. On the other hand, Bond and Share and its subsidiary holding companies have sold all or the major portion of the bonds and preferred stocks of operating companies acquired by them.

[16] Section 11, sub-section (b), of the Public Utility Holding Company Act of 1935, makes it the duty of the Commission to require each registered holding company and each subsidiary thereof to take such action as the Commission shall find necessary to limit the operations of the holding company's system of which such company is a part to a single integrated public utility system, and to such other businesses as are reasonably incidental, or economically necessary or appropriate to the operations of such integrated public utility system. Sub-section (e) permits any registered holding company or any subsidiary thereof to submit

the board of directors of the American Power and Light Company (a subsidiary of Bond and Share) in part because he could not agree to a proxy statement of

a plan to the Commission for the divestment of control, securities, or other assets, or for other action by such company or subsidiary thereof for the purpose of enabling such company or subsidiary to comply with the provisions of sub-section (b). Sub-section (e) further provides that if the Commission shall find such plan, as submitted or as modified, necessary to effectuate the provisions of sub-section (b) and fair and equitable to the persons affected by such plan, the Commission shall make an order approving such plan; and the Commission, at the request of the company, may apply to a court to enforce and carry out the terms and provisions of such plan.

Upon the passage of the Act, American Gas received a letter from the chairman of the Commission sent to all important holding companies under date of August 3, 1938, urging all such companies to file, by December 1, either a formal integration plan under Section 11, sub-section (e), or at least a tentative suggested program for complying with Section 11. American Gas was thus confronted with the question whether it should adopt an independent integration policy so that the provisions of the Act and the Commission's orders to effectuate them should be addressed to American Gas and its system directly and separately and not as a part of the system of Bond and Share. Believing that its system was one which met the requirements of Section 11, and that it was accordingly in a position to file a formal plan seeking an independent integration, American Gas replied on August 8 through Mr. Tidd to the letter of August 3, advising the Commission chairman that a formal plan would be filed; and the officers of American Gas went forward with the work of preparing such a plan. Up to that time there had been no consultation with Bond and Share and American Gas sought no such consultation. At the end of October, 1938, Mr. Groesbeck told Mr. Tidd that the members of the staff of Bond and Share were at work on a reply for Bond and Share to the letter of the Commission of August 3 and invited Mr. Tidd to luncheon to be advised of its nature. Mr. Tidd went to the luncheon accompanied by Mr. Philip Sporn (vice-president and chief engineer of American Gas and Electric Service Corporation, a vice-president of American Gas itself, and chief engineer of all of the subsidiary companies of American Gas). Mr. Inch was present. He showed a rough outline, including sketch maps, of an informal proposal which he had in mind filing on behalf of Bond and Share; this seemed to include, among the properties dealt with, those of American Gas. This material was taken away by Mr. Tidd and Mr. Sporn and after further examination of it by the latter and consultation between the officers of American Gas, it was determined that it was neither wise nor proper in the interest of American Gas for any of its officers to express an opinion as to the feasibility of the tentative proposals in the draft furnished by Mr. Inch—this for the reason that the proposals seemed to the officers of American Gas to be based upon premises opposed to the position which it seemed necessary for American Gas to take with respect to its status under Section 11. Therefore, Mr. Tidd, Mr. Millikan, Mr. Sporn and Mr. Burchill went to the offices of Bond and Share and met Mr. Groesbeck, Mr. Inch and a Mr. Murphy and a Mr. Phillips of the Bond and Share organization. At this conference Mr. Inch urged upon the four officers of American Gas that they abandon the intention of filing a formal plan under Section 11 and expressed the belief that such a course was a most unwise one. But the four officers of American Gas expressed an equal conviction that filing a formal plan under Section 11 was a sound and appropriate course for American Gas and left the conference. It was then decided as a result of this disclosure of opposing policies and views of the officers of American Gas and those of Bond and Share that it was inappropriate that American Gas should be represented in Section 11 proceedings before the Commission by the same firm of lawyers which was representing Bond and Share, and for that reason the officers of American Gas promptly selected and engaged a different firm to represent American Gas in the Section 11 proceeding and in the instant proceeding. The officers of American Gas then continued their work on the formulation of the formal plan and an outline in some detail of its nature and contents was made up and submitted to a meeting of the board of directors of American Gas on November 7, 1938. At that meeting the vote of the board, including Mr. Groesbeck and Mr. Farrar, was unanimous in favor of the independent integration policy and formal plan of American Gas.

The tentative plan of Bond and Share was filed on December 1, 1938. It included the American Gas system in the integration proposals of Bond and Share. Later Bond and Share filed an amended tentative plan which included American

American Power and Light Company to the effect that American Gas is an affiliate of Bond and Share.

What inferences may reasonably be drawn from these basic facts: I think that they support no reasonable inference of presently effective domination by Bond and Share of American Gas management or policies and that they reasonably support a contrary inference. That American Gas was organized by Bond and Share thirty-four years before the commencement of the hearing in this case is too remote and abstract a circumstance alone to support an inference that the management or policies of American Gas were at the time of the inquiry subject to a controlling influence by Bond and Share. The mere organization of one corporation by another is but a paper transaction, in and of itself unproductive of influence except through the impact of the personalities in the organizing corporation upon those of the organized. That Bond and Share was fiscal agent of American Gas from the time of its organization until the period 1928–1931 proves, without more, nothing now, that fiscal agency having terminated and American Gas since that period having had an established credit of its own and having alone carried out its own financing. The Commission urges that the fiscal agency of Bond and Share was a control of the purse prearranged at organization time and that it was hence the result, not the cause, of influence. But even if that is true, control of the purse is now gone. The presence in 1926 and theretofore upon the board of directors, executive committee and proxy committee of American Gas of a substantial number of persons who were connected with Bond and Share is evidence of a past possible means of influence by Bond and Share but is not, without more, evidence that the present

Gas in its integration proposals and which required exchanges, sales and purchases of properties of companies within the Bond and Share system, including American Gas. Mr. Inch testified before the Commission in the Bond and Share integration proceedings on September 1, 1940, as follows:

"Q. Corporately or as a matter of ownership, how could the regrouping shown by Map No. 3 be made? Is there in each group a diversity of holding company ownership?

"A. There is in every group a diversity of holding company ownership. That of course means that there would have to be in this integration plan, as probably in any integration plan for any companies, changes in ownership of property, exchanges, sales, purchases, and so forth. The fact that all of the holding companies shown here—the four principal holding companies own the securities of their subsidiaries by very large majority, representing in nearly all cases all or substantially all of the common stock, puts the intermediate holding companies, of course, in a position to cooperate in any plan for any such change in ownership as might be required. In turn, the Electric Bond & Share Company, which is the largest owner of the holding companies which own these properties, is, again, in a position to initiate and carry through any such changes of ownership as might be found desirable or necessary in bringing about the reintegration of the Bond & Share system.

"Q. Are all of these utility properties shown on Map No. 3 now parts of the Electric Bond & Share system, including for the moment in that system the American Gas & Electric Company?

"A. Yes, they are.

"Q. And it is for that reason that you think that Electric Bond & Share could function, with respect to the groups, just as the holding companies might function with respect to the properties within a group?

"A. That is correct.

"Q. Who is the largest holder of the voting securities in each of these intermediate holding companies?

"A. The Electric Bond & Share Company.

"Q. In each case, does that holding represent more or less than 10 per cent?

"A. In every case it represents more than 10 per cent of the voting securities of the intermediate holding companies concerned.

"Q. Is there in any case a comparable block of voting securities outstanding in other amounts?

"A. There is no comparable situation in any of these intermediate holding companies to the stock position of Bond & Share in the said companies.

"Q. Do you believe it would be feasible to regroup these utility properties in the manner here portrayed?

"A. I believe that with the approval of the Commission it would be not only possible but probably simple."

From the foregoing it is apparent that it was the intention of Bond and Share, had American Gas agreed not to file a formal plan of its own under Section 11, to regroup the properties of American Gas if necessary to the reintegration of Bond and Share.

654

management or present policies of American Gas are subject to a dominating influence by Bond and Share. And in view of the limited number of common directorships, executive committee memberships and proxy committee memberships at the present time, such a means for influence has greatly lessened. That certain of the present directors of American Gas were such during the period when Bond and Share was fiscal agent for American Gas also, in my mind, proves, without more, nothing now. If they were subservient then, the ascribed cause of that subservience has passed away. The debtor relationship which American Gas once bore toward Bond and Share has long since terminated, as has participation in group purchase and group engineering contracts. If it can be inferred that these relationships were once the cause of subservience, that cause has long since passed away. The fact of continued use of the same commercial and investment banks by American Gas and Bond and Share is not evidence of subjection of the former to the influence of the latter; that two companies deposit their funds in and borrow at or invest through the same bank is, to my mind, an irrelevant circumstance, one that does not reasonably support an inference that one company is influenced by the other; at the most such a circumstance is equivocal—if influence exists, in which direction does it operate? The existence of a common law firm (except in the Section 11 proceeding and in the instant proceeding) of itself proves nothing. Lawyers advise as to the law and as to legal policy; they litigate and draw instruments. But in the absence of evidence to the contrary, it is a fair presumption of fact that they do so singly to the interest of each client, and in the event of conflicting interests withdraw from one or another. There is no evidence that the law firm in question was retained by Bond and Share to advise it and American Gas as a part of the system of Bond and Share; it is a fair inference from the facts in the case that each company independently retained the firm. There is no evidence that the law firm in question ever advised American Gas against its interest and in favor of Bond and Share, or lent itself to influencing the management or policies of American Gas at the instance of Bond and Share. The scattered character of American Gas stock ownership outside the 17.51% owned by Bond and Share might, in the event of indifference or absence of common interest on the part of other stockholders or in the event of a combination of stockholders, result in a preponderant voting control in Bond and Share. But that is one of the types of control which, as said at the outset of this opinion, I think Congress intended to cover in clause (i) of Section 2(a) (8) of the Act, and, as I pointed out (in footnote 2), the Commission does not contend that American Gas is "controlled" by Bond and Share within the meaning of that word in clause (i). Moreover, there is no evidence in the case that either at the time of the inquiry or at any other time Bond and Share had preponderant voting power from any such event. The concession in the pleadings in the suit of Securities and Exchange Commission v. Electric Bond and Share Co., above referred to, that American Gas was a subsidiary of Bond and Share is to my mind of no probative value in respect of the issue in the instant case, first because it was made as of 1936 and second because it is a mere conclusion of counsel or of corporate officers and one not made on the record in the instant case; the Commission concedes in its brief that it itself does not consider this concession to be of conclusive character.[17]

[17] The Commission asserts that Mr. Tidd and Mr. Burchill testified that "while petitioner [American Gas] has been subject to a controlling influence by Bond & Share, that condition ceased to exist when Mitchell [Mr. S. Z. Mitchell, a former director and member of the executive committee of American Gas and a substantial stockholder] retired in 1933 as chairman of petitioner's board." The Commission then argues that Mr. Mitchell's retirement did not signify any change in the relationship between the two companies because Mr. Groesbeck succeeded him. But examination of the record shows that Mr. Tidd testified as follows:

"Q. Did Electric Bond & Share Company have a controlling influence over the American Gas & Electric Company at any period in the American Gas & Electric Company's history?

"A. I think it did, very early, when the company was first formed, although I will have to qualify that again, because I think for the first two years it was under the charge of Mr. Doherty as President. The Bond & Share looked more particularly after the money re-

In my opinion the foregoing facts, without more, whether looked at singly or altogether, cannot be said reasonably to support an inference that the management or policies of American Gas are under a present domination by Bond and Share. It

---

(quirements. Mr. Doherty had charge of the operation for two years.

\* \* \*

"Q. How long would you say that the controlling influence exercised by the Electric Bond & Share Company over the American Gas & Electric Company lasted?

"A. Well, I think *if there was any controlling influence* it was in the way of raising money, but the Bond & Share never have operated our properties. [Italics supplied]

"Q. How long would you say that controlling influence that you referred to lasted?

"A. Well, *if raising of money is a controlling influence*, for selling of securities, I think that ceased at practically the time that Mr. Mitchell left. [Italics supplied]

"Q. 1933?

"A. 1933."

The record shows Mr. Burchill's testimony to be as follows:

"Q. Without asking you for a legal conclusion and certainly not implying one of my own in this question, let me ask you this: *Assuming that there might have been at one time relationship between Bond and Share and American Gas which might have been considered as lodging in Bond and Share a controlling influence over American Gas, do you think it has disappeared, and if so, when?* [Italics supplied]

"A. I am quite convinced that it has disappeared; *on the assumption that there was something which you asked me to assume*, I am quite convinced it has disappeared, and I am equally clear in my mind that it came to an end in 1933, when Mr. S. Z. Mitchell left the Board of Directors and left the Executive Committee. [Italics supplied]

"Q. That was shortly after all the fiscal services of Bond and Share had, themselves, been discontinued as far as American Gas is concerned?

"A. Yes, the fiscal services of any importance, as has been testified, were pretty well terminated, the public offering of securities, at any rate, in 1928.

"The Examiner:—Why should the disappearance of this assumed control have coincided with the departure of Mr. Mitchell?

"The Witness:—Well, because it has never been clear in my mind, I don't know whether it is in anybody else's, whether Mr. Mitchell in the action he took in the American Gas and Electric

Board was acting as the representative of Electric Bond and Share, *but assuming for the purpose of answering your question that he was*, Mr. Mitchell, because of his personality, because of his intimate association with the company from its beginning, because of his large personal holding in the company, I think was able to exert an influence the like of which no other one man could exert, and the Executive Committee in that year, 1933, was made up of seven members. When Mr. Mitchell resigned from the Board and from the Executive Committee the membership was reduced to six, and it was subsequently reduced to five, and today there is only—and since, —well, for the last three years, at any rate, there has been only one person on there that I would in my non-legal fashion describe as the Bond and Share designee—Mr. Groesbeck, I don't know whether he is or not, but that is my reason, if I have answered the question, that Mr. S. Z. Mitchell because of his personality, I think because he was in a position, whether he did or not, to influence the American Gas and Electric Board in a way that no other person since can. [Italics supplied]

"The Examiner:—You feel that because of his earlier associations with Electric Bond and Share and his large holdings he would be more inclined to regard American Gas and Electric policies from the Bond and Share viewpoint than any successor would?

"The Witness:—No. I hope I haven't misled you on that. I have considerable doubt that he did so regard it. I happen to feel that American Gas having come into being as early as it did in 1906, when the Bond and Share Company was only a year or so old, that as the companies have gone ahead, I really believed that Mr. Mitchell looked on one as one thing and Bond and Share as another, in both of which he had two kinds of interest, financial interest and the interest of a builder and——

"By Mr. Ballard:

"Q. (Interposing) Director?

"A. Director, *but I was assuming for the purpose of answering your question* that Mr. Mitchell, inasmuch as he was a paid officer of Electric Bond and Share and was not a paid officer of American Gas, that it might be assumed or argued that when he came to American Gas Board meetings and sat there and talked he was representing Electric Bond and Share. [Italics supplied]

may be conceded that, from impact of personalities in Bond and Share upon those in American Gas at organization time and from such circumstances as the fiscal agency, the presence in the past upon the board of directors, executive committee and proxy committee of American Gas of a substantial number of persons who were connected with Bond and Share, the presence now upon the board of American Gas of some directors who were such during the period of the fiscal agency, the debtor relationship and group purchase and engineering contracts, and perhaps from other relationships thus far commented upon, there *might possibly* have been engendered in American Gas policies or tendencies which reflected and still reflect Bond and Share's desires. But as a matter of law the court is concerned in this case not with mere possibilities but with reasonable inferences, and I think that not by reasonable inference but only by assumption and conjecture can there be drawn from the facts thus far commented upon the conclusion that they show past relationships which have resulted in a personnel and tradition which make American Gas presently responsive to Bond and Share's desires. And it will be noted that if the conclusion reached by the Commission is to stand, it must be drawn from the facts thus far commented upon and not from the remainder of the basic facts, upon which I comment below.

Of the basic facts in the case only the following remain for discussion: The business and engineering policies of American Gas (the technique of generation, transmission and distribution of electric energy, construction standards, uniformity of practices and operations, retention or non-retention of non-electric utility properties, depreciation policy, rate structure policy, merchandising policy, policy as to extent of investment retained in subsidiaries, and policy as to financing (since 1928-1931) ) have from the outset been and are now different from those of Bond and Share; these business and engineering policies have been carried into effect from the outset by American Gas' own separate staff; the attempt of Bond and Share to cause the officers and directors of American Gas to submit to the integration policy of Bond and Share, rather than to carry out its own integration policy through the filing of a formal plan under Section 11 of the Act, failed through unanimous vote of the board of directors of American Gas including the two who were also directors of Bond and Share; the president of American Gas resigned from the board of American Power and Light Company rather than agree to a proxy statement of the latter to the effect that American Gas is an affiliate of Bond and Share.

These items of fact cannot be ignored—findings cannot be arrived at by considering only part of the evidence—and they involve both the management and policies of American Gas. These facts, while consistent with all of the other facts in the case, are, in my opinion, wholly inconsistent with the conclusion which the Commission has drawn, *i. e.,* that American Gas is "responsive to Bond and Share's desires." When looked at in terms of the accepted definition of substantial evidence as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, these facts support not the inference drawn by the Commission but its opposite, *i. e.,* the finding which American Gas urges ought to have been made in the case—that the "management or policies" of American Gas "are not subject to a controlling influence" by Bond and Share. How can it sensibly be said that the business and engineering policies of American Gas are subject to a controlling influence by Bond and Share when those policies have from the outset been and are now different from those of Bond and Share? Is it to be supposed that Bond and Share compelled a differentiation? There is no evidence that it did. How can it sensibly be said that the integration policy of American Gas was subject to a controlling influence by Bond and Share when it also was different? How can it sensibly be said that the management, including the business and engineering staff of American Gas, is subject to a controlling in-

---

"Q. Of course, he was the chief executive of Bond and Share through the decades when Bond and Share was doing the financing for American Gas, was he not?

"A. That is correct, yes, sir."

The foregoing makes clear that the gist of the testimony of these two witnesses was merely that *if* there was influence and *if* Mr. Mitchell in the action he took on the board of American Gas was acting as a member of Bond and Share, the influence ended with his resignation.

fluence by Bond and Share when such management and staff have carried out and continue to carry out business and engineering policies different from those of Bond and Share? How can it sensibly be said that the management of American Gas is subservient to the influence of Bond and Share when the board of directors, including two who are also directors of Bond and Share and who would, according to the theory of the Commission, vote responsively to the desires of Bond and Share, unanimously vote to carry out an integration policy different from that of Bond and Share,[18] and when the president of American Gas resigns a directorship in a Bond and Share subsidiary rather than agree to a statement that American Gas is an affiliate of Bond and Share? To the contrary of supporting the conclusion of the Commission in the case, the significant facts confirm a statement made by Mr. Inch in respect of the relationship of Bond and Share to American Gas that "In that company, we still hold a minority interest but we do not in any way supervise its operations nor have we ever done so. * * * . . . first of all, the Bond & Share Co. used its money and its credit to go out and get some operating properties to put together. When they were put together in this particular case it organized the American Gas & Electric Co. *and then that went off on its own . . . .*" (Italics supplied)[19]

The Commission attacks the significance for the independence of American Gas from a controlling influence by Bond and Share of the items of fact now under discussion not by denying them but only by contending that the policies involved are not of vital importance. But this contention is I think clearly without warrant. The business and engineering policies above described of a public utility obviously involve the very reason for being and way of life of such a company and determine its success or failure for stockholders, creditors and consumers. And the integration policy of a registered holding company— which, as explained above, American Gas itself is, whatever the outcome of this case

[18] It cannot be determined from the record whether Mr. Groesbeck at the luncheon to which he invited Mr. Tidd and at which Mr. Inch and Mr. Sporn were present, acquiesced in the view expressed by Mr. Inch. So far as the record shows, he may have invited Mr. Tidd as a mere accommodation—for a discussion of the question to be raised by Mr. Inch—or he may have then shared, or at the moment acquiesced in, Mr. Inch's view. As the incident is thus equivocal as to Mr. Groesbeck's then attitude, no inference as to the same can fairly be drawn from it. But assuming that in this luncheon discussion Mr. Groesbeck was influenced by Mr. Inch, it is clear that when the time came to vote as a director of American Gas he threw off that influence and voted in accordance with the views of the other directors of American Gas. Therefore, if the record shows anything concerning his being influenced, it shows that he was influenced either by his own judgment or by that of his fellow directors in American Gas and not by Bond and Share.

It is noteworthy that there is no evidence in the record, and no contention in the case, that any of the directors or officers of American Gas are or have been lacking in independence of judgment or in faithfulness to the interest of American Gas in any manner either critical or incidental; and in view of the undisputed success of American Gas as

a business enterprise (the record shows that American Gas has never since its organization suffered default or delay in the payment of interest or preferred dividends nor any interruption of dividends on common stock since such dividends were inaugurated in 1912) a contrary inference is warranted. Moreover, the long periods over which many of the directors have served tend to prove them independent and faithful. Long continued occupancy of responsible managerial positions in business is not often the result of subservience or unfaithfulness.

It is but fair to add that while it is shown in the record that Mr. Inch sought to persuade American Gas, i.e., its officers and directors, to act in accordance with the integration policy of Bond and Share, there is no evidence and no suggestion in the case of impropriety on his part or that he knew or thought that such a course would be against the interest of American Gas and its shareholders, creditors and consumers.

[19] This statement of Mr. Inch, which was stipulated into the present record, was made on March 28, 1935, before the Committee on Interstate and Foreign Commerce of the House of Representatives, in connection with the hearings then being held by that Committee prior to enactment of the Public Utility Holding Company Act of 1935.

—is vital to its life, to the preservation of its properties, under the "death sentence" provision of the Act. It is apparent from what is stated in footnote 16 that it was the intention of Bond and Share, had American Gas agreed not to file a formal plan of its own under Section 11, to regroup the properties of American Gas if necessary to the reintegration of Bond and Share.

If, under the facts in this case—where the company alleged to be exercising controlling influence owns but 17.51% of the voting stock of the alleged subsidiary, where but two out of the fifteen directors of the alleged subsidiary have any present connection with the other company, where there is no relationship of debtor ' and creditor and no present financial supervision by the alleged controlling company, where the business and engineering policies of the alleged subsidiary are materially different from those of the alleged controlling company and are carried out by a separate staff, and where the board of directors of the alleged subsidiary, including two members who are also directors of the alleged controlling company, are shown to have acted, in a matter vitally affecting the integration policy of the two companies, in accordance with the interest of the alleged subsidiary and contrary to the desire of the alleged controlling company—if in such a case it is proper to hold that the alleged subsidiary is in fact a subsidiary, what case can arise under the statute in which a non-subsidiary status will be declared? Refusal by the Commission to recognize non-subsidiary status in such a case as the instant case is equivalent, I think, to writing into the statute a fourth independent condition, such as was named in Pacific Gas & Elec. Co. v. Securities and Exchange Commission, supra which in effect puts it within the unfettered discretion of the Commission—without reference to the evidence—to determine that a subsidiary status exists.

I am forced to the view in this case that the conclusion of ultimate fact of the Commission has been reached by assumption and conjecture rather than according to inference rationally drawn from the basic facts. There is, to my mind, no coherent relationship between the basic facts and the conclusion reached by the Commission. The decision of the Commission, in my opinion, denies to American Gas the benefit of the rational significance of the basic facts which is that the "management or policies" of American Gas "are not subject to a controlling influence, directly or indirectly," by Bond and Share. I think the order of the Commission should be reversed.