## PUBLIC SERVICE CORPORATION OF NEW JERSEY v. SECURITIES AND EXCHANGE COMMISSION.

### No. 7879.

Circuit Court of Appeals, Third Circuit.

Argued April 24, 1942.

Decided Aug. 12, 1942.

Wendell J. Wright and William H. Speer, both of Newark, N. J. (George W. Grimm, Jr., of Newark, N. J., on the brief), for petitioner.

John F. Davis, of Philadelphia, Pa. (Chester T. Lane, Gen. Counsel, Homer Kripke, Sp. Counsel, and Maurice C. Kaplan, all of Philadelphia, Pa., on the brief), for respondent.

Before BIGGS, MARIS, and JONES, Circuit Judges.

MARIS, Circuit Judge.

The Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq., provides for the imposition of duties and liabilities upon holding companies and subsidiaries of holding companies. Section 2(a) (8) of the Act, 15 U.S.C.A. § 79b (a) (8), defines "subsidiary company" and authorizes a company to file with the Securities and Exchange Commission an application for an order declaring that it is not a subsidiary company of a specified holding company.[1] Pursuant to this statutory authority, Public Service Corporation of New Jersey applied to the Commission for an order declaring that it is

---

[1] "(8) 'Subsidiary company' of a specified holding company means—

"(A) any company 10 per centum or more of the outstanding voting securities of which are directly or indirectly owned, controlled, or held with power to vote, by such holding company (or by a company that is a subsidiary company of such holding company by virtue of this clause or clause (B)), unless the Commission, as hereinafter provided, by order declares such company not to be a subsidiary company of such holding company; and

"(B) any person the management or policies of which the Commission, after notice and opportunity for hearing, determines to be subject to a controlling influence, directly or indirectly, by such holding company (either alone or pursuant to an arrangement or understanding with one or more other persons) so as to make it necessary or appropriate in the public interest or for the protection of investors or consumers that such person be subject to the obligations, duties, and liabilities imposed in this title [chapter] upon subsidiary companies of holding companies.

The Commission, upon application, shall by order declare that a company is not a subsidiary company of a specified holding company under clause (A) if the Commission finds that (i) the applicant is not controlled, directly or indirectly, by such holding company (either alone or pursuant to an arrangement or understanding with one or more other persons) either through one or more intermediary persons or by any means or device whatsoever, (ii) the applicant is not an intermediary company through which such control of another company is exercised, and (iii) the management or policies of the applicant are not subject to a controlling influence, directly or indirectly, by such holding company (either alone or pursuant to an arrangement or understanding with one or more other persons) so as to make it necessary or appropriate in the public interest or for the protection of investors or consumers that the applicant be subject to the obligations, duties, and liabilities imposed in this title [chapter] upon subsidiary companies of holding companies. * * *"

not a subsidiary of The United Gas Improvement Company (hereinafter referred to as UGI) or of The United Corporation (hereinafter referred to as United). The Commission denied the application. Public Service has petitioned this court to set aside the order of the Commission. In support of its petition Public Service urges that the findings of the Commission were not supported by substantial evidence, that the Commission misconstrued the Act in reaching its conclusions, and that the proceedings were so conducted by the Commission as to deny to Public Service due process of law in violation of the Fifth Amendment.

■ We have examined the record in the light of Public Service's argument that the Commission's fact findings are not supported by substantial evidence and we find no merit in Public Service's contentions in this regard. Indeed some of these contentions are so wholly lacking in merit as to border on the frivolous. It is sufficient to say that the evidence fully supports the findings of the Commission which we summarize as follows:

Public Service was organized in 1903 under the laws of the State of New Jersey. Plans for its organization were submitted to the Board of Directors of UGI and approved by it. UGI transferred its interest in an electric company and leases in several operating gas companies to Public Service and received in return interest bearing certificates of Public Service. UGI subscribed to 25% of the original stock issue of Public Service and underwrote part of the total stock issue of $10,-000,000 par value. Under a contract for five years UGI supplied Public Service with engineering, purchasing and advisory service. UGI men served on the board of Public Service, on its finance, salary, works and budget committees and on the boards of several Public Service subsidiaries. United has had representation on the board of Public Service since 1930.

From 1927 to 1930 UGI directors and executives took an active and perhaps leading role in attempting to procure a contract for Public Service with the Pennsylvania Railroad to supply electricity to its newly electrified lines, even though a UGI subsidiary, Philadelphia Electric Company, was a logical competitor for the business. Not until it became apparent that Public Service could not get the contract and that an independent utility might, did Philadelphia Electric enter the field. The resultant contract between Pennsylvania Railroad and Philadelphia Electric made some provision for Public Service. Throughout the negotiations for the contract both UGI and United officials advised the president of Public Service as to the procedure he was to follow.

In 1928 Public Service and UGI pooled their interests in corporations devoted to construction work and organized United Engineers and Constructors, Inc. Although Public Service owned one-half of its stock United Engineers was managed by UGI almost exclusively. After United Engineers proved to be a financial failure all its problems were still dealt with by UGI until 1938, when Public Service and UGI simultaneously rid themselves of their stock ownership.

UGI participated in financing Public Service and in acquiring utility properties for Public Service. United and UGI helped to reorganize Public Service transportation subsidiaries. UGI negotiated with Columbia Gas and Electric Corporation, a subsidiary of United, to induce Columbia Gas to refrain from supplying natural gas in territory supplied by Public Service.

Following the passage of the Public Utility Holding Company Act in 1935 and the decision by the Supreme Court in Electric Bond & Share Co. v. Securities and Exchange Commission, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105, in 1938 UGI and United representatives resigned from the board of Public Service so that at the time of the Commission's present order there were no individuals serving as officers or directors of Public Service who were serving in similar capacities for UGI or United. However, Public Service and UGI continued until 1939 to utilize joint purchasing agencies, Public Service still continues to send UGI detailed monthly reports, a practice which it does not follow with other stockholders, and UGI offers suggestions and criticisms from time to time.

United and UGI are registered holding companies. UGI is a subsidiary of United. UGI owns 28.4% and United 13.9% of all outstanding voting securities of Public Service, a total of 42.3%. From 1929 through 1940 United and UGI cast a majority of the total number of votes which were cast at each annual meeting of Public Service stockholders. At the 1941 an-

nual meeting when United refrained from voting, UGI stock accounted for 49.2% of the total stock voted. Except for the stock held by United and UGI the securities of Public Service are widely scattered. The combined holdings of the next thirty largest stockholders aggregate but 8.85% of the outstanding stock of Public Service. In 1936, despite an extraordinary effort made by Public Service to procure proxies, only 79.1% of the outstanding stock was voted and of this the holdings of UGI and United represented 53.5%.

From the foregoing facts as to stock ownership the Commission concluded that as a practical matter if United and UGI so willed they could defeat any resolution or action recommended by Public Service management, could pass their own resolutions as to any matter which did not require a special vote, could "break quorum" at any stockholders' meeting, and could veto any corporate action which required a two-thirds vote of each class of stockholder, such as merger or consolidation. In the light of the close relationship between United, UGI and Public Service disclosed by the history of Public Service the Commission concluded that the continuing corporate intimacy was especially significant on the issue of controlling influence.

The Commission accordingly reached the conclusion that Public Service had not sustained the burden of proving that it was not controlled by UGI and United, or subject to their controlling influence.

In support of its contention that the Commission misconstrued and misapplied section 2(a) (8) of the Act Public Service alleges that the Commission treated the prima facie status of subsidiary, created by the Act whenever 10% of the outstanding voting securities are owned by a holding company, as evidence of a fact to be overcome by proof sufficient to satisfy the Commission beyond any possible doubt that there was an absence of present or possible future "control" of or a "controlling influence" over Public Service by UGI and United; that the Commission imposed upon Public Service the burden of demonstrating to the satisfaction of the Commission that it is not now controlled, or subject to a controlling influence by UGI and United and that there is no possibility of any such control or controlling influence in the future; that the Commission construed "controlling influence" as any influence; that

the Commission construed the Act as giving it absolute discretion to determine what constitutes "control" and "controlling influence" and to determine whether or not it is necessary or appropriate in the public interest or for the protection of investors or consumers that Public Service be subject to the obligations, duties and liabilities imposed by the Act upon subsidiary companies of holding companies; and that the Commission failed to give effect to the direction in the Act that when it is shown that a controlling influence does not presently exist the application for an order declaring the applicant not to be a subsidiary must be granted.

■ Most of these contentions are wholly beside the point for the reason that they are without factual basis in the record. Thus, upon examination of the Commission's fact findings and opinion we discover that in arriving at its conclusion the Commission did not rest its decision upon any presumption arising from the ownership of 10% of voting stock of a utility company by a holding company but relied entirely upon evidence presented at the hearing before its trial examiner as to the effect of the stock ownership upon the relations of the three corporations. Again, although the Commission used the word "demonstrated" when referring to the burden which the Act places upon the applicant, there is no basis for concluding that the word was intended to connote "absolute certainty" as Public Service would have us find. Indeed, the only conclusion which can fairly be drawn from the Commission's opinion as a whole is that it proceeded upon the theory that the burden of proof which is imposed by the Act upon an applicant is to establish by a preponderance of the evidence that it is not controlled or subject to a controlling influence by a holding company. Such a conception of the burden of proof is entirely correct in the light of the express provisions of the Act, of ordinary rules of statutory construction and of generally accepted rules of evidence. Nor is there any merit in the assertion that the Commission construed the words "controlling influence" as any influence. The force of the adjective "controlling" was expressly acknowledged by the Commission.

■ Public Service strongly urges that the phrase "controlling influence", as used in the Act, means an influence presently exercised and that the Commission erred

when it said that " 'control' and 'controlling influence' as they are used in section 2(a) (8), include the power to control and the power to exert a controlling influence, as well as the actual exercise of such power." We think the words were correctly construed by the Commission. The words "controlling influence" were similarly construed by the Circuit Court of Appeals for the Sixth Circuit in Detroit Edison Co. v. Securities & Exchange Commission, 1941, 119 F.2d 730, certiorari denied 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. —. The court there said (119 F.2d pages 738, 739) "The present Act undertakes to bring within its ambit all subsidiaries subject to 'controlling influence' of a parent. This phrase should be construed in the light of the purpose of the Act of which it is a part, and when understood in this setting and in the light of its ordinary signification, it means the act or process, or power of producing an effect which may be without apparent force or direct authority and is effective in checking or directing action, or exercising restraint or preventing free action. The phrase as here used, does not necessarily mean that those exercising controlling influence must be able to carry their point. A controlling influence may be effective without accomplishing its purpose fully." A "controlling influence" may exist, although in a latent form. Detroit Edison Co. v. Securities & Exchange Commission, supra. Even though, after 1938, UGI and United did not utilize their voting strength to elect directors, pass resolutions or veto corporate changes the latent power to do so was a present power to exert a "controlling influence" upon Public Service at any time.

. We therefore find no error in the construction or application of Section 2(a) (8) of the Act by the Commission.

Public Service claims that it was deprived of due process of law as guaranteed by the Fifth Amendment because the Commission refused to direct the trial examiner to make a report and findings of fact, because the Commission did not make findings of basic facts and because of alleged errors which permeated the entire proceedings.

We shall deal first with the effect of the denial of an intermediate report and fact findings. When the Commission refused this request it directed counsel for the Commission to file requests for specific fact findings on June 15, 1941 and a brief in support of the requests on July 1, 1941 to be followed by requests for specific fact findings and brief in support thereof by counsel for Public Service on July 15, 1941 and a reply brief by counsel for the Commission on July 25, 1941. Oral argument was then to be had before the Commission on July 30, 1941. This procedure was in fact followed.

The Fifth Amendment guarantees no particular form of procedure. That the denial of an intermediate report does not deprive the applicant of due process provided it is notified of the issues and contentions of the parties in some reasonable manner was decided by the Supreme Court in National Labor Relations Board v. Mackay Co., 1938, 304 U.S. 333, 58 S. Ct. 904, 82 L.Ed. 1381. In that case Justice Roberts said (304 U.S. pages 350, 351, 58 S.Ct. page 913, 82 L.Ed. 1381): "At the conclusion of the testimony, and prior to oral argument before the examiner, the Board transferred the proceeding to Washington to be further heard before the Board. It denied respondent's motion to resubmit the cause to the trial examiner with directions to prepare and file an intermediate report. In the Circuit Court of Appeals the respondent assigned error to this ruling. It appears that oral argument was had and a brief was filed with the Board after which it made its findings of fact and conclusions of law. The respondent now asserts that the failure of the Board to follow its usual practice of the submission of a tentative report by the trial examiner and a hearing on exceptions to that report deprived the respondent of opportunity to call to the Board's attention the alleged fatal variance between the allegations of the complaint and the Board's findings. What we have said sufficiently indicates that the issues and contentions of the parties were clearly defined and as no other detriment or disadvantage is claimed to have ensued from the Board's procedure the matter is not one calling for a reversal of the order. The Fifth Amendment guarantees no particular form of procedure; it protects substantial rights. Compare Morgan v. United States, 298 U.S. 468, 478, 56 S.Ct. 906, 910, 80 L.Ed. 1288. The contention that the respondent was denied a full and adequate hearing must be rejected."

That a procedure such as that adopted by the Commission in this case is unobjectionable was made clear by Chief Justice Hughes in Morgan v. United States, 304

U.S. 1, pages 21, 22, 58 S.Ct. 773, 777, 999, 82 L.Ed. 1129, in which he said, "The Government adverts to an observation in our former opinion that, while it was good practice—which we approved—to have the examiner, receiving the evidence in such a case, prepare a report as a basis for exceptions and argument, we could not say that that particular type of procedure was essential to the validity of the proceeding. That is true, for, as we said, what the statute requires 'relates to substance and not form.' Conceivably, the Secretary, in a case the narrow limits of which made such a procedure practicable, might himself hear the evidence and the contentions of both parties and make his findings upon the spot. Again, the evidence being in, the Secretary might receive the proposed findings of both parties, each being notified of the proposals of the other, hear argument thereon, and make his own findings."

Section 2(a) (8) of the Act, 15 U.S.C.A. § 79b (a) (8), under which Public Service made its application, sets forth in detail the issues which were properly before the Commission, the Commission's notice and order for hearing did the same, the evidence presented by counsel for the Commission, their proposed fact findings, their brief and reply brief in support of those proposed fact findings afforded cumulative and overwhelming proof that Public Service was well informed of the issues involved and of all facts and theories relied upon by counsel for the Commission in opposition to the application. We conclude that the denial of the request for a trial examiner's intermediate report and fact findings was not a denial of due process of law.

The contention of Public Service that the Commission did not make findings of fact in proper form or sufficiently indicate its basic findings is without merit. We agree with the Circuit Court of Appeals for the Tenth Circuit in its statement in Swift & Co. v. National Labor Relations Board, 1939, 106 F.2d 87, 94, that "It is not essential that the Board state its findings in formal style. It is sufficient if it make findings which clearly and definitely state the basic facts upon which its ultimate conclusions and decision rest."

Finally we turn to Public Service's own summary of the other items upon which it bases its claim of deprivation of due process. The Commission erred, it says, in "placing on the petitioner an undue burden of proof, using false scales to weigh the evidence, disregarding substantial proof, and expressly treating it as negligible; unreasoningly and unreasonably treating unimpeached witnesses as unworthy of belief and classifying them in the same class as tax evaders, and calling their testimony 'wide-eyed disavowals;' using non-existing evidence as a basis of reaching a conclusion, and other indulgence in like actions." We can but state that our examination of the record does not convince us that any of these charges of improper action on the part of the Commission are justified. The Commission adhered closely to the main issue before it and refused to be drawn into deciding matters not involved in that issue. It examined the evidence to determine whether Public Service had proved by a fair preponderance thereof that UGI and United did not control or exercise a controlling influence over Public Service. It found no such preponderance of evidence and consequently was not able to find as true those facts which were necessary to support Public Service's application. Its denial of the application inevitably followed.

The order of the Commission is affirmed.