## PACIFIC GAS & ELECTRIC CO. v. SECURITIES AND EXCHANGE COMMISSION.

### No. 9918.

Circuit Court of Appeals, Ninth Circuit.

Nov. 18, 1943.

Dissenting Opinion Nov. 22, 1943.

Rehearing Denied Feb. 23, 1944.

Herman Phleger, Wm. B. Bosley, and Robert H. Gerdes, all of San Francisco, Cal. (James S. Moore, Jr., and Brobeck, Phleger & Harrison, all of San Francisco, Cal., of counsel), for petitioner.

Chester T. Lane, Gen. Counsel, Securities and Exchange Commission, Christopher M. Jenks, Asst. Gen. Counsel, and Lawrence S. Lesser, all of Washington, D. C., and E. M. Calkin, of Philadelphia, Pa. (Arnold R. Ginsburg, Eugene Gressman, and Julian M. Meer, all of Philadelphia, Pa., of counsel), for respondent.

Before WILBUR, GARRECHT, DENMAN, MATHEWS, STEPHENS, and HEALY, Circuit Judges.

PER CURIAM.

Order of Securities and Exchange Commission herein affirmed by an equally divided Court.

GARRECHT, Circuit Judge (dissenting).

I dissent from the per curiam decision entered herein denying the petitioner's application, for the reasons hereinafter stated.

This cause has been pending before the court upon a rehearing en banc. Former opinions of this court herein are found in 127 F.2d 378 et seq.

The issues arise on the petition of Pacific Gas and Electric Company to review and modify or set aside an order of the Securities and Exchange Commission, which denied petitioner's application for an order, pursuant to Section 2(a) (8) of the Public Utility Holding Company Act of 1935, 49 Stat. 803, 807, 15 U.S.C.A. § 79b (a) (8), declaring it to be not a subsidiary of the North American Company, a registered holding company owning more than 10% of the petitioner's voting stock.

Pacific Gas and Electric Company, petitioner, in the evidence and also herein sometimes referred to as P. G. & E., is a California corporation, organized in 1905. On March 23, 1912, the Public Utilities Act of California, St. 1911, Ex.Sess., p. 18, became effective, and since that date the Company could issue securities only with the approval of the Railroad Commission of California. All its securities now outstanding, have been authorized by the said Commission except 15% of its common stock which was issued prior to March 23, 1912. All the Company's public utility properties are located in, and its business is conducted in, the state of California.

The Public Utility Act, hereinafter called the Act, became effective on August 26, 1935, 49 Stat. 803. The portions of said Act pertinent to this discussion are as follows:

"Sec. 2(a) (8) 'Subsidiary company' of a specified holding company means—

"(A) any company 10 per centum or more of the outstanding voting securities of which are directly or indirectly owned, controlled, or held with power to vote, by such holding company (or by a company that is a subsidiary company of such holding company by virtue of this clause or clause (B), unless the Commission, as hereinafter provided, by order declares such company not to be a subsidiary company of such holding company; and

"(B) any person the management or policies of which the Commission, after notice and opportunity for hearing, determines to be subject to a controlling influence, directly or indirectly, by such holding company (either alone or pursuant to an arrangement or understanding with one or more other persons) so as to make it necessary or appropriate in the public interest or for the protection of investors or consumers that such person be subject to the obligations, duties, and liabilities imposed in this title upon subsidiary companies of holding companies.

"The Commission, upon application, shall by order declare that a company is not a subsidiary company of a specified holding company under clause (A) if the Commission finds that (i) the applicant is not controlled, directly or indirectly, by such holding company (either alone or pursuant to an arrangement or understanding with one or more other persons) either through one or more intermediary persons or by any means or device whatsoever, (ii) the applicant is not an intermediary company through which such control of another company is exercised, and (iii) the management or policies of the applicant are not subject to a controlling influence, directly or indirectly, by such holding company (either alone or pursuant to an arrangement or understanding with one or more other persons) so as to make it necessary or appropriate in the public interest or for the protection of investors or consumers that the applicant be subject to the obligations, duties, and liabilities imposed in this title upon subsidiary companies of holding companies. The filing of an application hereunder in good faith shall exempt the applicant from any obligation, duty, or liability imposed in this title upon the applicant as a subsidiary company of such specified holding company until the Commission has acted upon such application. Within a reasonable time after the receipt of any application hereunder, the Com-

mission shall enter an order granting, or, after notice and opportunity for hearing, denying or otherwise disposing of, such application. * * *"

Section 6 of the Act, 49 Stat. 814, 15 U.S.C.A. § 79f, makes it unlawful for a subsidiary company of a registered holding company to issue or sell any of its securities except with the approval of the Commission.

It appears that North American Company, hereinafter called North American, owns, controls and holds with power to vote, 17.71% of petitioner's outstanding voting securities and is therefore, by statutory definition, a subsidiary of North American, unless declared otherwise by the Commission. Following the provisions of the Act, petitioner, on November 29, 1935, sought by appropriate petition to bring itself within the exemptions provided in the Act by alleging and offering to establish that (1) it is not controlled, directly or indirectly, by North American; (2) it is not an intermediary company through which control of another company is exercised; and (3) its management or policies are not subject to such a controlling influence, directly or indirectly, by North American, so as to make it necessary or appropriate in the public interest or for the protection of investors or consumers, that it be subject to obligations, duties, and liabilities imposed in the Act upon subsidiary companies.

On September 4, 1940, the Commission directed a hearing upon such application and on October 10, 1940, directed that such hearing commence. It began on November 12, 1940, and was concluded on January 16, 1941. The hearing was had before a trial examiner. Although there was no real dispute as to the facts as set forth in the trial examiner's report, both counsel for petitioner and counsel for the Commission filed with the trial examiner separate requests for specific findings.

The trial examiner on April 22, 1941, made his report and findings of fact. He found and concluded that petitioner was entitled to the order which it sought. Thereupon counsel for the Commission filed exceptions to the report, and the matter was presented to the Commission upon briefs and oral argument and thereafter on September 10, 1941, the Commission entered its order denying petitioner's application. The case was brought to this court upon

petition to review and modify or set aside said order.

The Commission, in concluding its findings and opinion, said:

"* * * we hold that applicant has not demonstrated that its management and policies are not subject to the controlling influence of North American, so as to make it necessary or appropriate in the public interest or for the protection of investors or consumers that the applicant be subject to the obligations, duties, and liabilities imposed by the Act upon subsidiary companies of holding companies.

"We desire to emphasize that our holding in this respect is not to be taken to mean that any stigma is cast upon applicant or that we think that applicant is not properly regarded as a California corporation. Nor do we mean to indicate that the influence of North American necessarily is or will be improperly exercised. The only question which we have decided is that, in the circumstances of this case where the statute presumptively requires that PG&E be regulated as a subsidiary of North American, the facts in the record before us do not demonstrate that PG&E is entitled to be excepted from the general requirement of regulation as a subsidiary of a registered holding company."

Further, the Commission said:

"* * * There is almost no dispute as to the facts in the case as they are set forth in the trial examiner's report and in the briefs of both counsel. The point of issue with respect to the application under Section 2(a) (8) is rather one of statutory interpretation and in this respect we cannot agree with the conclusions reached by the trial examiner. Our reasons for this decision are as follows:

"First, it is clear that the application herein cannot be granted unless we can find that applicant has sustained the burden of demonstrating that its management and policies are not subject to the controlling influence of North American. * * *"

. We call attention to the fact that the findings and conclusions of the Commission are based on inference and surmise in many instances in absolute conflict with the testimony which was uncontradicted and not discredited. The Commission made inferences to support its finding, as follows:

North American owns 17.71% of the voting stock in petitioner. The second largest stockholder owns 1.72% of the voting stock. The rest of the stock is owned by corporations and individuals, scattered widely. Of the total voting stock 47.9% is held by non-residents. The Commission said: "* * * It is apparent that if a vital and substantial conflict arose between applicant and North American and matters came to the point of a proxy fight, the holdings of North American represent a tremendous advantage in any such fight. Counsel have argued as to the possible outcome of such a proxy fight. We need not speculate here as to whether North American's 17.71% of voting power, plus the votes it could attract would be offset by the voting power which the local management could attract. It cannot be denied that, in any event, North American's holdings would make it a formidable opponent. And the mere fact that there is a strong possibility that North American could prevail would, in itself, be a potent tool in influencing the management to give heed to North American's wishes."

North American's holdings have represented from 25% to 30% of the total votes cast at stockholders' meetings from 1931-1940. The Commission said: "* * * First, so long as North American is satisfied with the present management, North American's voting power and the proxy machinery in the hands of the management, make it virtually impossible for any other interest or group of interests to elect a majority of the directors. Second, North American's votes have represented 25 to 30% of the votes cast at stockholders' meetings and, by virtue of its stockholdings, North American had the power to break a quorum of all but two stockholders' meetings since it became applicant's largest stockholder; if it had chosen to do so, no business could have been transacted at such meetings. Third, the ownership of virtually ⅓ of applicant's common stock gives North American an effective veto power over any corporate action requiring the consent of ⅔ of each class of stock—e.g., mergers and consolidations."

Petitioner's present president is one Black, formerly an employee of Great Western Power Company. North American acquired control of Great Western in 1925, and in 1927, Black went to New York as vice president of North American—his principal duties at that time being to keep in touch with and assist Great Western and its subsidiaries.

In 1930, following negotiations begun in the previous year between Black and petitioner's then president, the petitioner acquired the securities held by North American in Great Western Power Company and its subsidiaries. It was orally agreed that North American would not interfere with petitioner's management, that North American would be entitled to three members on petitioner's board of directors and one member on its executive committee. Black became a member of petitioner's board of directors as North American's representative. Regarding these facts, the Commission said: "It is wholly untrue to characterize North American's relationship to P. G.&E. as merely that of a stockholder holding an investment interest. It now has two of its representatives on P.G.&E.'s board of directors, and by cumulating its votes it could elect at least three directors. Moreover, under the agreement made at the time of the Western Power Deal, it could at any time have a representative elected to applicant's executive committee. Against the background of the other facts we have discussed, the fact that North American has been given the 'right' to such representation on applicant's board of directors and executive committee is, we think, of material significance. We find some significance, too, in the frequent and detailed reports of every phase of applicant's operations sent by applicant to North American; no such reports are sent to any other stockholder."

Further, the Commission said: "Nor can we disregard the fact that applicant's most important executive officer, Black, its president, was, for eight years just prior to his appointment, a senior executive of North American. From February 1927 to June 1930 Black's primary duty as vice president of North American was to exercise holding company supervision over the activities of the subsidiaries of Western Power Corporation. He conducted the negotiations for North American in which Western Power was transferred to P.G.&E. and as a result of which North American acquired its interest in P.G.&E. For five years, from 1930 to 1935, Black was the individual in the North American organization who, more than any other one person, kept advised as to applicant's business and followed applicant's affairs in the light of North American's interest. It is also significant that since Black became president of P.G.&E., no effort has been made by North American to have representation in the executive committee, and no one in North American's management has followed applicant's affairs as closely as he did. It is wholly unreal to suppose that Black would be uninfluenced by these circumstances and in his dealings with North American, would treat it as merely a large stockholder of P.G.&E."

Admittedly, P.G.&E. is not controlled by North American and is not an intermediary company, therefore clauses (i) and (ii) of Section 2(a) (8) of the Act are not here involved. The only issues arise under clause (iii), which requires petitioner to show that "the management or policies of the applicant are not subject to a controlling influence, directly or indirectly, by such holding company * * * so as to make it necessary or appropriate in the public interest * * * that the applicant be subject to the obligations, duties, and liabilities imposed in this title * * *." Although the initial burden is on petitioner to prove to the Commission that its management and policies are not subject to North American's "controlling influence", the Commission's function is to draw adequate and fair inferences from the evidence. This the Commission failed to do.

It is an admitted fact that petitioner's utility properties are all located, and its business is conducted in the state of California. In this regard the Commission said: "On the basis of the record before us we find that applicant and all of its subsidiary companies are predominantly intrastate in character and carry on their business in California, the state in which each of them is organized, and that applicant is predominantly a public utility company whose operations as such do not extend beyond the State of California. * * *"

Petitioner is subject to the public utilities act of said state and can issue securities only with the approval of the California Railroad Commission. This state commission by its representatives appeared at the hearing and presented a statement, which was received by the Commission, showing the manner and extent of its regulation of appellant, and in this document the California Railroad Commission stated that it was "aware of no instance during the course of this Commission's regulation of Pacific Gas and Electric Company when its management or policies appear to have been either controlled or influenced by North American Company."

While the Commission concedes that the evidence shows there is no control of petitioner by North American, the Commission maintains that it may still deny petitioner's application upon the assumption or supposition that merely ownership of 17.71 per cent of the stock of petitioner by North American renders it subject to the controlling influence of such holding company despite the fact that there never has been any exercise of control or any effort in that direction and in the face of the evidence of the officers of North American that it holds the stock as an investment only and that there is no intention to exercise any control over petitioner and the further evidence of the officers and management of petitioner that they would not permit such control.

### The Question of Control

Referring to the question of control as indicated by stock ownership, the court in Electric Bond & Share Co. v. Securities and Exch. Comm., 2 Cir., 92 F.2d 580, 592, said: "* * * Congress elected the element of stock ownership, a factor most usually indicative of control, as prima facie evidence of control. The burden of proof, which is cast upon the utility company to prove otherwise, is not onerous. Judicial review is provided to guard against any arbitrary action on the part of the Commission and to afford a remedy should the Commission's finding be not supported by substantial evidence . * *. *"

That case was subsequently affirmed by the Supreme Court of the United States under the same title, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105. In the latter case the Department of Justice, for the Securities and Exchange Commission, filed an able and carefully prepared brief, discussing various sections of the Act. Upon the subject of stock control, because of the clearness of the reasoning and aptness of application to the present discussion, I quote from the brief the following (Br. for Resp., p. 6, of Apx. A): "A holding company, by express definition * * * is a company which actually controls operating companies, and not a company which merely has an investment in operating companies. Conversely, a subsidiary company, by express definition * * * is a company actually controlled by the holding company, and not simply a company in which the holding company has a substantial interest. Ten percent voting stock ownership creates a presumption of control in order to facilitate administration of the Act and to prevent ready evasion. That presumption, however, can readily be rebutted by either the putative holding company or the putative subsidiary company (Section 2(a) (7) and (8) upon a showing that the company does not in fact exercise control. * * * No true investment company—i. e., a company which does not control the operating companies in which it invests—is in any manner affected by it.

The following quotation is also from that brief (Br. for Resp., pp. 197, 198): "* * * a company may readily prove if such be the fact that it does not possess control. Such burden of proof is not onerous because every company has completely within its own organization full knowledge and control of all the facts and the evidence * * *. Judicial review is provided to guard against any arbitrary action on the part of the Commission, and to afford a remedy should the Commission's findings of fact be not supported by substantial evidence (Section 24(a) [15 U.S.C.A. § 794 (a)]). * * *"

With these declarations of the court and from the Commission in mind let us have a look at the testimony as found in the record and not contradicted.

The present board of directors consists of five directors who are officers and full-time employees of petitioner, eight directors who are prominent San Francisco business men, and two directors, Fogarty and Freeman, who are admittedly representatives of North American. Neither of these two North American representatives is a member of the executive committee.

All directors and principal officers, with the exception of the two directors who are officers of North American, are residents of San Francisco and vicinity; were either born in California or came to California early in life and have resided in California since that time; are prominently identified with California enterprises, and have no substantial interest in any eastern concern, business or corporation whose business is not principally conducted in California. During the entire period of petitioner's existence the members of the board of directors, with few exceptions, have been residents of San Francisco and vicinity, and have owned and do own and represent substantial stock interests in petitioner, and the fathers of four directors (directors C. O. G. Miller, Norman B. Livermore, A. E.

Wishon and W. W. Crocker) were active in the affairs of predecessor companies. All of the directors, with the exception of Fogarty and Freeman, know each other well, some are associated together in other enterprises, and several have known each other from boyhood.

The directors, other than those who are active executives of the Company, and excepting Fogarty and Freeman, are prominent in other business affairs in San Francisco and vicinity; two are chairmen of boards of local banks, one is president of a third bank; all are directors of numerous corporations, including other utilities, and several are officers or trustees of educational or charitable institutions.

Each of petitioner's local directors to whom the question was propounded, namely, Messrs. Miller, McKee, Crocker, Chickering, Livermore, Coghlan, Palmer, Nichols, McIntosh, Wishon and Black, testified that it was his opinion that North American could not, if it attempted to do so and its attempts were resisted by the local directors, secure sufficient proxies to obtain a majority of the stock represented at a stockholders' meeting.

Mr. Black testified that he would oppose any attempt by North American to control or influence the management or policies of the petitioner with "every resource at my command" and that he was sure they would not be successful in a proxy fight because:

"This company has a rather unique position in San Francisco and in California. It has been known for many years as a California company. The fact that the Great Western Power Company was controlled by an eastern company, the Western Power Corporation, was a great handicap to the Great Western Power Company in doing business here and particularly in competition with the Pacific Gas and Electric Company. I know something of that feeling. I think 48 per cent of our stock is held here in California and I think without question that stock would be almost unanimously opposed against any attempt by any eastern interest, particularly any New York holding company, to get control of the company.

"Our directors are men not only who are men who own, or are able to influence very large blocks of stock directly, but they have a standing in the community and in the business world which I think would be very decisive in getting large amounts of stock

proxies from holders outside of the State. I am sure that the community as a whole would be entirely on the side of the company in any such fight."

Director Fogarty, the representative of North American on the board, testified that the management or policies of petitioner were neither directly or indirectly subject to the controlling influence of North American. Nor had that company ever attempted to influence or control the management. He also said that as a practical matter it would not be possible. Mr. Freeman, the other representative, corroborated this view. Mr. Fogarty never attended a directors' meeting. This is also true of Mr. Freeman, who has never been in California.

The testimony of all of these witnesses is not contradicted.

With the exception of Fogarty and Freeman the evidence clearly indicates that the other directors, most of whom were prominent business men of San Francisco and vicinity, were tough-fibered individuals who could not be dominated by outside influences. That was the substance of the testimony and so far as these persons are concerned this testimony admittedly is uncontradicted. In determining the question of "controlling influence" the evidence must be considered and this the Commission did not do. It was simply waved aside as of no importance whatever.

It is probably worth remarking in this connection that North American has never solicited proxies; in fact, its officers or representatives have never voted its own stock, its proxies having been sent to other stockholders. If there existed any apprehension that North American might seek proxy control, the Commission has the power to prevent North American from soliciting any proxy.

To reach the conclusion arrived at by the Commission every circumstance is viewed with a hostile eye and every instance tortured into some semblance of sinister purpose. Thus, the selection of James B. Black as president of appellant upon the unexpected death of Mr. Hockenbeamer, who had been president for many years, is pointed to as unmistakeable proof of the influence exerted by North American, because at the time of Black's appointment he was the vice-president of North American.

It must be admitted that Black probably was as well qualified for the position as

anyone anywhere; his career is altogether a notable one. His personal, professional, and administrative achievements are detailed at some length in the record, from which I summarize briefly: He came with his parents to California at the age of twelve and has lived in San Francisco and vicinity ever since, with the exception of a short period when he resided in New York and served as vice-president of North American. He was educated in the schools of Oakland and San Francisco and at the University of California, from which he was graduated in 1913 in engineering. After graduating he was employed as a service inspector by City Electric Company, then a subsidiary of Great Western operating in San Francisco. About 1915, the properties of City Electric Company were taken over by Great Western, and Mr. Black successively engaged in sales, sales engineering, and administrative work in its San Francisco division. Later he became division manager, assistant general agent and general sales manager, and acting general manager, and in 1922 was made vice-president, general manager and a director of that company. After North American acquired control of Western Power Corporation, Mr. Black retained these positions until February, 1927, when he went to New York at the invitation of North American as one of its vice-presidents.

His selection as president of Pacific Gas and Electric Company was entirely the result of the action of the California directors of that company, many of whom were acquainted with Black's capabilities. The facts that he was a Californian, that he was familiar with some of the properties of the company, and had wide experience were deemed qualifications, and his selection met with the unanimous approval of the board of directors. No suggestion of Mr. Black's election was made by anyone in North American; his selection was not anticipated by the officers of that company, to whom it was a surprise. There is no evidence in the record indicating that North American played any part in the choice of Black as president of the petitioner, other than to consent when the California directors asked permission to offer the position to him. When Black accepted the position he assured the California directors that he would sever all connections with North American. He has never sought or received the advice, approval, or recommendations of North American or its officers on any dividend rate, salary, refinancing, or any other pending matter. There is no difference between the information received by North American or in the relations with petitioner since Black became president and the situation existing before that time.

Not only did the Commission disregard the uncontradicted evidence substantiating that there was no "control" or "controlling influence", it also disregarded a specific and important instance revealed by the evidence which very persuasively negatived such control. At one of the meetings of the board of directors of Pacific Gas and Electric, at which the question of declaring a dividend was up for consideration, it was voted that the dividend for that year be declared at the rate of six per cent instead of the usual eight per cent. The representatives of North American requested the board to reconsider this action, but it did not accede to the request.

Notwithstanding the uncontroverted evidence to the contrary the Commission went off into the realm of speculation as to what might happen if North American should undertake to engage in a proxy fight with appellant's existing management for control, and it determined that the mere fact that there might be a strong possibility (based likewise on conjecture) that North American could prevail was itself proof of "susceptibility" to a controlling influence.

There are other instances where the Commission very frankly has interpreted the testimony of the witnesses contrary to their evidence. These interpretations, which are exaggerated into some semblance of an argument, are then designated as inferences of the Commission as to "events which might happen" but "not what actually happened". As approving these methods, the Commission quotes an excerpt from National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 597, 61 S.Ct. 358, 365, 85 L.Ed. 368, as follows: "Congress entrusted the Board, not the courts, with the power to draw inferences from the facts. * * * The Board, like other expert agencies dealing with specialized fields * * * has the function of appraising conflicting and circumstantial evidence, and the weight and credibility of testimony." But here there is no conflicting evidence to appraise, and as to weight and credibility of testimony it must be noted that the witnesses who testified contrary to the findings were outstanding men of affairs in Cali-

fornia, and they were not contradicted or impeached, and no reason appears in the record why they should be discredited.

According to the Commission petitioner was required to "demonstrate" non-control or influence by North American. The Act does not require any such mathematical extreme which excludes possibility of error. 23 C.J. 9; 32 C.J.S. Evidence, § 1016. It is sufficient if such showing is supported by substantial competent evidence which is not contradicted. Due process requires that the competent evidence adduced be fairly considered by the Commission on its merits. As was said by Justice Brandeis in speaking for the court in the Chicago Junction Case, 264 U.S. 258, 265, 44 S.Ct. 317, 319, 68 L. Ed. 667, "The provision for a hearing implies both the privilege of introducing evidence and the duty of deciding in accordance with it. To refuse to consider evidence introduced or to make an essential finding without supporting evidence is arbitrary action." In Morgan v. United States, 298 U.S. 468, 480, 56 S.Ct. 906, 911, 80 L.Ed. 1288, Chief Justice Hughes said: "* * * The requirement of a 'full hearing' has obvious reference to the tradition of judicial proceedings in which evidence is received and weighed by the trier of the facts. The 'hearing' is designed to afford the safeguard that the one who decides shall be bound in good conscience to consider the evidence, to be guided by that alone, and to reach his conclusion uninfluenced by extraneous considerations which in other fields might have play in determining purely executive action. * * *"

This court is not called upon to determine the credibility of witnesses or to reach a conclusion upon substantially conflicting facts. Indeed, no such question is presented here, since the Commission has said in its opinion that: "There is almost no dispute as to the facts in this case as they are set forth in the trial examiner's report and in the briefs of both counsel. The point of issue with respect to the application under Section 2(a) (8) is rather one of statutory interpretation and in this respect we cannot agree with the conclusions reached by the trial examiner", who found that Pacific Gas is not in fact controlled by, or subject to the controlling influence of, North American.

The Commission relies strongly on Detroit Edison Co. v. Securities & Exchange Commission, 6 Cir., 119 F.2d 730; Public Service Corporation of New Jersey v. Securities and Exchange Commission, 3 Cir., 129 F.2d 899; and Hartford Gas Co. v. Securities and Exchange Commission, 2 Cir., 129 F.2d 794. A glance at these cases will show how utterly different were the facts there presented.

In the Hartford case, 2 Cir., 129 F.2d 794, two affiliated holding companies owned 21.98 percent of the petitioner's voting stock. Not only was the president selected from one of the subsidiaries of the holding company but he frequently had advice from his former associates and secured help from the holding company's engineers in effecting changes in the petitioner's business methods. Petitioner for years submitted a preliminary draft of its annual budget to the holding company. It obtained much of the gas that it sold to its customers through some community of interest arrangement with subsidiaries of the holding company. The cost of the gas that petitioner so purchased prior to 1940 amounted to 58 percent of all its regular operating expenses.

In the Public Service Corporation of New Jersey case, 3 Cir., 129 F.2d 899, the court pointed out that the petitioner was organized pursuant to plans submitted by the holding company which not only subscribed for 25 percent of its original stock but also underwrote part of the stock issued.

Further under contract it supplied petitioner with engineering, purchasing and general advisory service.

The president of Public Service Corporation testified that he could not have become president of the corporation against the wishes of the holding company and that no plan of the kind contemplated in its organization could have been accomplished without the affirmative approval of the holding company. See Public Service Corp. of New Jersey v. S. & E. C. Release No. 2998, Sept. 15, 1941.

There were many other instances of interlocking relationships, indeed, the record was so replete with evidence of the participation of the holding company in Public Service Corporation affairs that the court passing on the appeal was moved to remark, 129 F.2d 901 that the evidence supporting the findings was so conclusive and the contentions of petitioner were so wholly lacking in merit as to border on the frivolous.

Probably the case the Commission most relies upon is the Detroit Edison Co. v. Securities & Exchange Commission, 6 Cir., 119 F.2d 730, as this case is cited in the Commission brief not fewer than nine times.

It is submitted that the facts in that case are so different from the one before us that it cannot be considered an authority to support the action of the Commission here. In the Detroit Edison case, by agreement with two existing companies, a syndicate organized by North American acquired their stock and organized the Detroit Edison Company. Its officers and directors were all designated by North American. On behalf of its syndicate North American then offered all of the stock of the corporation and agreed to finance and furnish other assistance to the new company on certain terms. By the deal the syndicate acquired three million dollars of Edison's first mortgage bonds and fifty thousand shares of its stock. The Edison then began operations. Thereupon the syndicate dissolved, and North American retained more than 10 per cent of petitioner's outstanding voting securities. The record shows that the North American dominated the board of directors through the years, and at the time of the hearing the majority of directors still had affiliations with North American. There were other intercompany relationships too extended to detail here, but referred to in the opinion and which had been discontinued not long before the hearing. From these facts it was concluded that in the light of Edison's origin and the unbroken continuity of North American's officers, directors, and designees on its board, and its absolute domination for many years by the parent company, it was not entitled to an order granting exemption from the statute. In summing up the situation the court said:

"The fact that the North American Company had abandoned some of the characteristics of 'controlling influence' over the petitioner at the time of the hearing, did not require the Commission to disregard prior interrelated activities. There is no showing that its latent power to resume such control had been extinguished. The relationship is such that they may enter into similar activities in the immediate future.

"* * * Giving due weight to the past transactions of petitioner with the North American and the continuing opportunity for the resumption of such activities and the extent of the petitioner's business and the widely scattered ownership of its stock, the Commission committed no error in denying petitioner exemption from the present Act." 119 F.2d at pages 739, 740.

All the evidence in the case before us shows a complete absence of such relationships and of any control throughout the period since North American became an owner of certain stock of Pacific Gas and Electric Company because of the transfer by it of certain utility properties that it had theretofore owned.

It is significant too that those incidents of relationship which are referred to as indicative of controlling influences in practically all of the decisions which have been cited to us by the Commission are notably absent in this case as the trial examiner pointed out:

"There have been no contracts between Applicant and North American or its subsidiaries except the contract dated March 29, 1930. (The agreement by which PGE acquired the properties of North American in California.)

"Neither North American nor any of its affiliates or employees has ever performed any services with or without charge, for Applicant.

"There has been no exchange of operating information between the Applicant and the admitted subsidiaries of North American.

"There have never been any intercompany loans or financial transactions between the Applicant and North American or its subsidiaries.

"All of Applicant's major acquisitions and construction projects have been and are decided upon, budgeted and carried out within the PG&E organization and entirely independent of North American at all stages.

"North American's organization has never assisted Applicant in the preparation of any Registration Statements, nor has its Secretarial Department ever assisted Applicant in any manner.

"Applicant and North American do not employ the same accountants, attorneys or engineers.

"Applicant does not employ any former officers or employees of North American, with the exception of Mr. Black, and with the exception of those who were officers or

employees of acquired companies at the time of their acquisition. North American has never recommended or suggested to Applicant the employment of any person or been asked its views thereon.

"No employees of Applicant, nor of North American or of its admitted subsidiaries have ever been loaned by either to the other."

The Commission admits that the record does not reveal any past attempt by North American to interfere with its management or policies. It is likewise conceded that there is no evidence of actual control, nor, as has been shown, is there any substantial evidence from which any legally sound inference can be drawn that there ever was any effort whatsoever by North American to subject appellant to any controlling influence. Nor is there any testimony in the record from which any fair inference can be drawn that petitioner was subject to the controlling influence of North American.

### Subject to a Controlling Influence

Petitioner makes the point that the Act requires some present controlling influence, not a speculative future influence, as ground for denial of an application for a declaration. The term "subject to a controlling influence" means that approximately as of the time of the hearing the controlling influence must be actually existent even though not actively executed and that some mere potential or possible or speculative influence is not sufficient. The statute seems to imply such an interpretation. It reads "subject to a controlling influence". The word "subject" suggests some present existing quiescent controlling power that could be rendered active at will. This may also be inferred because in this very Section 2(a) (8) it is provided that even where the Commission has acted favorably and made an order of exception this finding of the nonexistence of "controlling influence" may be only conditional and temporary, and "The Commission, upon its own motion or upon application, shall revoke the order * * * whenever in its judgment such modification is necessary" to effectuate the law. These provisions indicate that the Congress intended to cover a situation where there might be some "susceptibility" of such influence in the future but where

none presently existed and that it did not intend that a declaration should be withheld in the absence of present active controlling influence.

From the discussion in Congress at the time the Act was under consideration and as well from the fair and ordinary meaning of the language, the phrase "subject to a controlling influence" does not mean, as the Commission found, that appellant was required to "demonstrate" that its management and policies were not "susceptible to control" by North American. "Subject to a controlling influence" is not the equivalent of "susceptible to a controlling influence". "Susceptible" and "subject" are not interchangeable or synonymous terms. The word "susceptible" connotes an especial liability to mental and emotional impressions. Advisedly that expression was not used in the statute. But the word "subject" is used, and here it occurs in relation with "control", and in that sense it must correctly be continued as meaning under the power or dominion of another. It is synonymous with subordinate, inferior,[1] "To control" means to exercise a restraining or direct influence over; to dominate; regulate; hence to hold from action; to curb; to subject.[2] Moreover, "controlling" means the act or fact of exercising restraining influence over, which conveys the idea of a continuing process. Thus, "subject to a controlling influence", as stated in the statute, is not the same thing as "susceptibility" to a controlling influence as expressed by the Commission. One phrase refers to an actually existing state; the other might be applied to some future condition which uncertain events might possibly bring about. In considering this aspect of the matter it is important to keep in mind that under the statute as above noted the Commission is in a position to act at once if ever the susceptibility should become an actuality, even if the Commission had theretofore granted petitioner an exemption at a time when the facts showed a lack of any actual and existing control or controlling influence.

It is also clear that the vague, artificial tests here employed are not sanctioned by the Act. Nor was it expected that inferences based upon inferences, or suppositions, or even possibilities, would be substituted for substantial evidence.

---

[1] See Webster's New International Dictionary.

[2] Ibid.

308

The facts presented to the Commission and all reasonable inferences, deductions, and conclusions to be drawn therefrom, considered in their entirety and in relation to one another, negative the findings of the Commission. The inferences which are suggested as supporting the order of the Commission are based on mere suspicion. In National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 299, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660, Mr. Justice Stone said: "* * * But as has often been pointed out, this, as in the case of other findings by administrative bodies, means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred. * * * Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' * * *".

In vesting the Commission with the duty of ascertaining "control" or "subject to a controlling influence" of one company by another Congress did not imply that a potential facility to exercise control was sufficient to establish such controlling influence. If this alone were sufficient the Congress would not have made provision for the exemption.

The legislative history of the Act corroborates this view. In the course of the debate on the bill, Senator Wheeler, chairman of the Committee in charge, said, with reference to the 10 percent clause (79 Cong. Rec., p. 8397): "That is only prima facie evidence; but even if they hold 40 percent of the stock of a company they may come before the Commission and produce evidence that they are not actually in control of the company, and the Commission is directed to make a finding and to exempt them if they are not actually controlling the company as the word 'control' is defined in the bill."

Again, Senator Wheeler said (79 Cong. Rec., p. 8439): "No, Mr. President. Let me make a distinction. The Senator from Delaware said: 'Suppose I own 10 percent of the stock of some company.' Unless I control that company I am not a holding company under the terms of this bill. The mere ownership of the 10 percent of the stock does not of itself make him a holding company, because unless he actually controls the company he is not a holding company. The Senator may overlook the factor of control. He may show that he actually does not control the company in which he owns 10 percent of stock, and if he does not have control he is not a holding company."

Neither the Commission nor the Court is warranted in departing from the purposes expressed because of any doubts that may exist as to the wisdom of following the course which Congress has marked out.

There must be some substantial evidence before the Commission that there exists such a controlling influence as would enable the holding company to bring about the evils enumerated in the Act. There is no such showing in this case.

On the contrary, the evidence affirmatively shows, as the examiner in his findings pointed out, the absence of the evils which the Act was designated to prevent.

Pacific Gas and Electric Company never had any financing, purchasing, service, management, construction or similar contracts with North American or its affiliates.

North American has never had anything whatever to do with accounting practices and rate dividends and other policies of Pacific Gas and Electric Company.

There are and have been no management, service, sales, construction or other contracts in existence, nor has there been, nor is there any evidence of control or influence exerted or attempted to be exerted over Pacific Gas and Electric Company's finances, management, and policies.

Present prospective investors in Pacific Gas and Electric securities can obtain information necessary to appraise its financial condition and earning power. It issues a comprehensive annual report and keeps its accounts in accordance with a uniform system prescribed for gas and electric corporations by the California Railroad Commission, all of which are open to the public. During all the years North American has been a stockholder in the Pacific Gas and Electric Company, it has never had any transactions with Pacific Gas and Electric Company other than the original purchase from it in 1930.

There has been no increase or extension of North American's interest in Pacific Gas and Electric, and its relative voting power is less than it was immediately after it became a stockholder in 1930. The list enumerating the absence of many evils

usually relied upon by the Commission in these cases is extended at length in the findings of the examiner, which have not been questioned. They are too numerous to detail here.

Moreover, under the Act the Commission now actually exercises over North American, as a registered holding company, such control as is itself sufficient to prevent the occurrence of any transaction or dealing between the companies as would violate the Act. While no such transactions have ever occurred and the evidence that they would not occur is uncontradicted, still the Commission by virtue of this control over North American can at once prevent them should they be proposed. Indeed, the Commission has already made an order which was affirmed by the Circuit Court of Appeals for the Second Circuit, North American Co. v. Securities and Exchange Comm., 133 F.2d 148, under which North American is required to dispose of its stock in petitioner.

To sustain the Commission on the record here would require us to hold, as the court did on the first hearing, that its determination of what is necessary in the public interest is a matter within the uncontrolled discretion of the Commission. This is not the proper interpretation of the statute and counsel representing the Commission do not so contend.

The order of the Commission not being supported by substantial evidence should be set aside.

MATHEWS, Circuit Judge, joins in this dissent.